**In the Matter of BALDWIN–UNITED CORPORATION, D.H. Baldwin Company, et al., Debtors.**

**Bankruptcy No. 1–83–02495.**

United States Bankruptcy Court, S.D. Ohio, W.D.

Oct. 16, 1987.

O'Melveny & Myers, Los Angeles, Cal., for debtor.

Raymond L. Shapiro, Philadelphia, Pa., for Blank, Rome, Comisky & McCauley.

Paul S. Aronzon, Los Angeles, Cal., for Gendel, Raskoff, Shapiro & Quittner.

Donald Alexander, Washington, D.C., for Cadwalader, Wickersham & Taft.

Hugh Rowland, Jr., New York City, for Debevoise & Plimpton.

Cleary, Gottlieb, Steen & Hamilton, New York City, for Shearson Lehman Bros, Inc.

Mark I. Wallach, Calfee, Halter & Griswold, Cleveland, Ohio, for First Nat. Bank of Chicago.

William F. Martson, Jr., Tonken, Torp, Galen, Marmaduke & Booth, Portland, Or., for First Interstate Bank of Oregon.

Irving Harris, Cincinnati, Ohio, for Porter, Wright, Morris & Arthur.

Bernard Shapiro, Los Angeles, Cal., for California First Bank.

Thomas F. Butler, Jr., AmeriTrust of Cleveland, Cleveland, Ohio, for AmeriTrust Co., N.A.

Joseph Chirvin, Rosenman, Colin, Freund, Lewis & Cohen, New York City, for IBJ Schroder Bank & Trust Co.

Peter Wolfson, New York City, for Booth, Marcus & Pierce.

Martin J. Bienenstock, Weil, Gotshal & Manges, New York City, for Leucadia Nat. Corp.

RANDALL J. NEWSOME,
Bankruptcy Judge.

On September 26, 1983 a company whose president was determined to make it the largest financial services firm in the world came crashing into this bankruptcy court with assets charitably valued at approximately $9 billion and debts estimated variously at $9 billion or multiples thereof. At 10:05 a.m. on that date involuntary Chapter 11 petitions were filed against Baldwin-United Corporation ("BU") and D.H. Baldwin Company, ("DHB") a holding company held by BU. Three minutes later, voluntary Chapter 11 cases were filed on behalf of the same companies in New York City. The next day, the Debtors consented to the jurisdiction of this Court.

On March 18, 1986 this Court confirmed plans of reorganization which encompassed these two entities as well as their subsidiaries and affiliates which numbered in excess of 200.

■ This Court is now called upon to determine whether and to what extent certain parties and professionals should share in some $3.5 million which was set aside in the plan of reorganization for additional fees under 11 U.S.C. § 330 as well as for fees under 11 U.S.C. § 503(b)(3) and (b)(4). Pursuant to that end, on April 7 and 8, 1987 an evidentiary hearing was conducted on the parties' applications and the objections thereto.[1] Leucadia National Corpora-

1. During the first day's hearing on this matter the Court announced its intention to "look at anything that's part of their [sic] bankruptcy record" in considering these requests for compensation, and stated that everyone was "put on notice right now" as to that intention. (Tr. of April 7, 1987, at 130–131). No objections were raised then and none have been raised subsequently as to the propriety of the Court's taking judicial notice of its own files. Nevertheless, we feel it appropriate to address the issue since the task of passing on these requests for compensa-

tion has entailed an extensive review of the voluminous files of these cases.

First, the Code contemplates that the Court will perform an independent review of fees requested by professionals in order to determine whether they are reasonable and whether the services performed and expenses incurred were actual and necessary. 11 U.S.C. §§ 329, 330 and 503(b). Judicial scrutiny is required whether or not objections to fee requests are filed. *In re Wildman*, 72 B.R. 700, 705 (Bankr.N.D.Ill.1987); *In re Affinito & Son, Inc.*, 63 B.R. 495, 497

tion, which holds a controlling interest in the reorganized company, has objected to all of these applications on factual and legal grounds. Pursuant to the testimony and exhibits presented as well as the pre- and post-trial briefs, proposed findings and other submissions, the Court hereby submits its findings of fact, opinion and conclusions of law.

## BACKGROUND

For anyone totally unfamiliar or even marginally familiar with the history of these cases, the prospect of awarding all or part of $3.5 million in fees and expenses in addition to the almost $32 million already awarded might seem blatantly silly (or worse), notwithstanding the hundreds of exclamatory statements scattered throughout the record concerning the complexity, enormity, and difficulty of the cases. In order to fully understand this redundant chorus of superlatives, it is necessary to provide a distilled overview of the circumstances and events leading up to the filing of these bankruptcies as well as the endless chain of intractable problems which occurred thereafter.

Although recognized by the public primarily as an established manufacturer of quality pianos, by 1980 Baldwin's piano business had become a quaint sideline when compared with its financial empire. The building of that empire, as masterminded by company president Morley P. Thompson, began slowly in the 1960s and early 1970s with the purchase of a group of banks in Denver (Central Bancorporation, Inc.) and a Denver savings and loan (Empire Savings & Building & Loan Association). In the late 1970s Thompson's diversification program for the company kicked into high gear. To the extent any guiding concepts existed for the monster that was eventually created, three now seem apparent: structure business transactions to avoid taxes; pay for acquisitions with other people's money; and never make a clean, complete divestiture of anything.

The centerpieces for this evolving money-machine were two insurance companies, National Investors Life Insurance Company ("NILIC") of Arkansas purchased in 1978, and College/University Corporation of Indiana, acquired in 1979. In 1979 NILIC and University Life Insurance Company (a subsidiary of The College Life Insurance Corporation of America, which in turn was a subsidiary of College/University Corporation) along with three other insurance company subsidiaries domiciled in Arkan-

(Bankr.W.D.Pa.1986); *In re Jensen–Farley Pictures, Inc.,* 47 B.R. 557, 585 (Bankr.D.Utah 1985); *In re Wilson Foods Corp.,* 36 B.R. 317, 320 (Bankr.W.D.Okla.1984). The intelligent performance of this function presumes that fee judgments will be made with the benefit of hindsight.

The Court is unaware of any method of reviewing the history of a case that does not involve taking notice of its own case files. "[T]he power of a court to take judicial notice of its own records is amply established by a multitude of cases." 9 C. Wright & A. Miller *Federal Practice and Procedure,* Civil § 2410 (1971). The necessity of taking judicial notice of an entire case file is particularly acute in the context of bankruptcy fee contests, and we adopt the reasoning of Judge Johnson set forth in *In re Saco Local Development Corp.,* 30 B.R. 862 (Bankr.D.Me.1983). There, the Court was dealing with a liquidation analysis under the preferential transfer section of the Code, and recognized that the language of Federal Rule of Evidence 201, which deals with judicial notice, must be interpreted to accommodate the distinctive nature of bankruptcy cases:

A bankruptcy case is unique because it is composed of many individual parts. Within the debtor's case itself, the bankruptcy judge considers many matters which affect the amount of the dividend to unsecured creditors, including applications to compromise, notices of intent to sell or abandon property of the estate, objections to claims and exemptions, and applications for fees by trustees and attorneys. In addition, the trustee or a third party may file adversary proceedings, which also affect the dividend. The judge will consider complaints for relief from stay, to avoid preferential or fraudulent transfers, to turnover property of the estate, to sell free and clear of liens, and objecting to certain claims. It would be impossible for bankruptcy judges to ignore all the other decisions they have made in a bankruptcy case and related proceedings when deciding the matter before them.

In addition, bankruptcy judges would be remiss if they did not take this information into consideration. Bankruptcy judges may be the only individuals involved in a bankruptcy with an overall view of the case.

*Id.* at 865.

sas and Indiana, began issuing an insurance product known as a Single Premium Deferred Annuity ("SPDA"). For a lump sum payment in the $20,000 range, the investor received an annuity which accrued interest at an initial rate as high as 15% with a minimum rate of not less than 7.5%. These annuities were particularly attractive to investors approaching retirement, since the tax on the interest was deferred until the annuity was cashed in or otherwise paid out. Sales of these annuities went from $9 million in 1979 to a staggering $1.45 billion and $1.6 billion in 1981 and 1982, respectively. A total of $3.7 billion in cash from SPDA sales was received in less than four years.

In order to minimize the federal tax payable on the profits from these sales, certain SPDA insurance companies reinsured the SPDAs of others at a loss. National Investors Pension Insurance Company ("NIPIC") was created to handle most of this reinsurance. As a noninsurance company, it was taxable at a rate of 46%, while gains from the sale of the SPDAs by the insurance subsidiaries were taxable at a 23% rate. Since NIPIC was consolidated for tax purposes with other noninsurance subsidiaries in the Baldwin system, its losses could be used to offset the gains of those other entities.

In order to make this tax arbitrage work, Thompson had to acquire companies with sufficient earnings to offset NIPIC's losses. Toward this end, Baldwin went on a buying spree. Between 1980 and 1981, it spent at least $527 million acquiring a number of companies or interests therein, including a group of mortgage banking companies, a mortgage insurance company, and Sperry & Hutchinson Company, Inc. ("S & H"), the largest trading stamp company in the world. Much of the cash for these acquisitions was siphoned out of the premiums paid by the SPDA holders through dozens of convoluted transactions.

Motivated by the need for additional profits to offset NIPIC's now enormous losses, as well as by unchecked ambition and vainglory, the decision was made in March of 1982 to purchase MGIC Investment Corporation, a company whose numerous subsidiaries included the largest private mortgage insurer in the United States and one of the largest insurers of municipal bonds. In order to raise the $1.17 billion purchase price, a new subsidiary called Balunit, Inc. was created to hold MGIC. Balunit took out a $584 million one-year loan from a consortium of banks, which received a pledge of all of MGIC's stock as security for the loan. An additional $70 million of the purchase price was borrowed by another subsidiary and soon repaid. The remaining $517 million was squeezed out of Baldwin's other subsidiaries through dozens of intercompany transfers primarily from the SPDA companies, and was replaced with stock in Balunit, mortgages, leaseholds, and real estate. The transactional analysis of this wrenching of cash out of the system defies description, but an excerpt from the Indiana rehabilitator's 178–page proof of claim in these cases adequately conveys its science fiction flavor. (See attached Exhibit A.)

With the purchase of MGIC, the stage was set for the house of cards to rapidly collapse. The problems and weaknesses inherent in the SPDA companies began to emerge. The SPDA premiums could not generate enough investment income to cover both the unrealistically high interest rates promised by the annuities and the up-front expense of 6% on each one sold. Furthermore, the Baldwin affiliate stocks and other assets which had replaced the cash in the insurance reserves were generating little, if any, income.

To say that the insurance regulators of Arkansas and Indiana became alarmed at the precarious nature of the SPDA companies' reserves by the end of 1982 is a gross understatement. To make up the perceived shortfall, the regulators required Baldwin to transfer hundreds of millions of dollars in additional affiliate securities and assets into the SPDA reserves.

Ultimately, the SPDA companies received some $926 million in affiliate assets, and had direct or indirect ownership of virtually all of BU's and DHB's assets. The ability to move income from assets in

the lower holding company tiers of the corporate structure to service the massive debt in the upper tiers ceased.

In the meantime, the insurance commissioner of Wisconsin thwarted Baldwin's plans to sell off hundreds of millions of dollars in MGIC assets to help pay off the Balunit bank loan. The commissioner also limited the amount of dividends payable on MGIC's stock.

The disastrous implication of these events led to a frenzy of intercompany transactions to generate cash, not only to pay off the Balunit debt, but to pay dividends and interest on the 20 or more publicly traded stocks, bonds and debenture issues then outstanding, as well as hundreds of millions of dollars in other loans held by dozens of banks and other lenders.

These efforts ultimately proved futile. In March, 1983 Thompson announced that the Balunit loan could not be repaid. Faced with a default on this loan as well as other obligations, in April, 1983 Thompson negotiated a standstill agreement with Baldwin's major creditors which gave the company two months to restructure its short-term debt. While this agreement provided some breathing room, it also served to drive a wedge between the company's previously unsecured bank lenders who received security interests under the agreement, and other unsecured creditors who were given nothing.

Meanwhile, fears of the company's imminent collapse led to the beginnings of a redemption run by the 165,000 SPDA holders, further aggravating the $11 million in losses per month which the SPDA companies were experiencing from their negative investment spread.

In May of 1983 the BU board of directors removed Thompson as president and hired The Palmieri Company to manage and attempt to rescue the company. Victor H. Palmieri became BU's president and chief executive officer, and Peter A. Martosella, Jr. became executive vice-president and chief operating officer.

While Palmieri was successful in putting together a second standstill agreement in June of 1983, the inherent tension between the unsecured bank lenders and other unsecured creditors was not eased. This was particularly true of those unsecured creditors holding BU debentures arising out of the bizarre, quasi-divestiture of Central Bancorporation, Inc. in 1980, out of which DHB ended up with a 92.4% limited partnership interest in the banks' holding company, Central Colorado Company. *See, In re Baldwin–United Corp.*, 43 B.R. 888 (Bankr.S.D.Ohio 1984).

The trouble in the SPDA subsidiaries came to a head on July 13, 1983, when the insurance commissioners of Arkansas and Indiana filed rehabilitation proceedings against NILIC, NIPIC, and the other four SPDA insurance subsidiaries. As part of its order of rehabilitation, the Arkansas court issued an injunction against all entities making any claims against or pursuing any of the assets of the SPDA companies.

Finally, with the 90–day preference period about to run out on the transfers of security interests to the unsecured bank lenders, a group of debenture holders filed the September 26, 1983 involuntary Chapter 11 petitions.

What confronted the professionals in these cases from the outset was a mine field of bad business deals; hundreds of intercompany transactions; thousands of furious and fighting creditors and shareholders; legal and equitable claims to all but a tiny percentage of the Debtor's assets; and almost no cash. Expectations for recovery of 10 cents on the dollar were not unduly pessimistic. (Tr. of April 8, 1987 at 254.)

While it is common in Chapter 11 cases to have a flurry of excitement among the creditors for the first few days after the matter is filed, the violent and sustained intensity of the activity during the first six months of these cases was overpowering. Attempts by competing creditor groups (which included many if not most of the largest banks in New York and the Midwest) to carve out and reserve portions of the Debtors' assets for their own special benefit began almost immediately. The earliest, most serious of these attempts

was by the First National Bank of Chicago, the indenture trustee for the three series of BU debentures issued in connection with the Colorado bank divestiture. First Chicago, as well as individual debenture holders, asserted that cash distributions to DHB as a limited partner in the banks' holding company were not rightfully property of the estate, and that they should be impressed with a constructive trust in the debenture holders' favor. Such a set-aside would have dried up the Debtors' primary source of cash, and was strongly opposed by both the Debtors and other creditors. First Chicago filed an adversary proceeding to enforce the debenture holders' rights, which in short order degenerated into a "swollen maze of claims, motions, heated discovery proceedings, and general confusion." *In re Baldwin–United Corp.*, 45 B.R. 382, 383 (Bankr.S.D.Ohio 1984) The litigation ended up engulfing the Debtors, the Colorado bank and its subsidiaries, at least 23 of the debenture holders and their individual counsel, former BU debenture holders who wanted to become debenture holders again, the BU unsecured creditors' committee, which filed a claim against DHB, and the DHB unsecured creditors' committee. After four months of carnage, proceedings in this adversary were stayed by order of this Court. *Id.*

Riding tandem with this proceeding was one brought against First National Bank of Chicago by certain bank creditors who as a part of the June standstill had traded their debentures for notes, and who sought to be restored to debenture holder status. This same group also moved to disqualify counsel for the DHB creditors' committee on conflict of interest grounds. Ultimately, counsel for the committee resigned to avoid yet another piece of costly and time-consuming litigation. The former debenture holders also sought (unsuccessfully) to form their own committee, alleging that their interests were too opposed to the members of the BU committee to be effectively represented by that committee.

The hostility among the creditor groups demonstrated in the First Chicago litigation was apparent in hearings even on mundane matters. Many hours were spent trying to determine how many committees should be formed, who should be on the creditors' committees, whether they would be voting or non-voting members, whether certain invitees should be permitted, and whether the nonvoting members should be allowed to attend all of the meetings. *See, e.g., In re Baldwin–United Corp.*, 38 B.R. 802 (Bankr.S.D.Ohio 1984).

The vociferousness of the creditors, particularly the BU creditors and their committee, was attributable in part to the fact that BU held most of the debt, while its subsidiary holding company, DHB, held most of the free assets. As a result, seemingly simple matters, such as a motion to continue existing bank accounts and cash management system, generated a cross fire between the creditor groups, with the Debtors caught squarely in the middle. The question of who was going to pay for the costs of administration for these cases continued for over four months and generated skirmishes over such important matters as the assumption of The Palmieri Company's contract. Ironically, an agreement was finally reached between the committees which split the costs 50–50 between the estates.

The fundamental question which had loomed large from the outset of these cases and remained to be resolved was whether the estates should be substantively consolidated. Had a motion to consolidate the assets and liabilities of the estates been pursued, it would have taken weeks to resolve. Fortunately, the issue never came to a head, largely because Debtors' lead counsel, O'Melveny and Myers, prepared an extensive position paper on the issue which was presented to all of the committees for their consideration. While the Debtors, with pressure from the BU committee, eventually filed a motion to consolidate, it was continued from month to month with creditor and shareholder agreement. Fortunately, a substantive consolidation of the estates was effectuated consensually through a provision in the reorganization plan.

The internal corporate problems which arose in these cases were not merely diffi-

cult, but unprecedented. Leading the list were those involving the corporate directors. Both before and after the filing of these cases, certain creditors and shareholders brought a number of actions against the corporations, their former officers and present and former directors alleging securities fraud and various other state and federal claims. *See, e.g., Stoller v. Baldwin–United Corp.*, 41 B.R. 884 (S.D.Ohio 1984). In characteristic Baldwin fashion, the company had no directors' and officers' liability insurance even though one of MGIC's subsidiaries sold such policies. An initial question was raised as to whether the same law firm should represent both managerial and outside directors, a question which this Court decided in the negative. *In re Baldwin–United Corp.*, 45 B.R. 378 (Bankr.S.D.Ohio 1983).

A far more difficult issue, raised by the creditors' committees, was whether the cost of defending the present and former non-management directors could be advanced by the estates, where the corporate by-laws provided for such indemnification. This court held that such expenses could be advanced pursuant to the terms of the by-laws. On appeal, the District Court held that litigation expenses could not be advanced to former directors, but left open the question of whether they might be entitled to administrative expense priority after judgment. *In re Baldwin–United Corp.*, 43 B.R. 443, 456 (S.D.Ohio 1984). As for the present directors, the Court held that litigation expenses could be advanced upon a showing that each director individually was crucial to the Debtors' ability to reorganize.

As a result of this decision, as well as the Examiner's critical evaluation of their role in Baldwin's collapse, the involved members of the board of directors resigned, leaving Palmieri to search for new directors in the midst of the reorganization effort.

In addition to the battles being fought within the bankruptcy court, counsel for the Debtors (both O'Melveny & Myers and Debevoise & Plimpton, which served as special counsel to the Debtors) were be-sieged on numerous other fronts. Due to the resignation or removal of many of the company's key personnel, O'Melveny was forced to assume a managerial role within the Palmieri group as well as serve as general counsel. The initial managerial problem was to retrace the supersonic vapor trail left behind by Thompson's business dealings, a problem compounded by horse-and-buggy accounting and record-keeping systems which were still being conducted manually by a mere handful of employees. When all of this information was sifted out and tallied, the Debtors' condition was even grimmer than suspected: at least a $1 billion negative net worth.

O'Melveny's time sheets, particularly those of senior partner John Roney, reflect an endless procession of unpleasant surprises, new combatants, and skeletons jumping out of closets. Every day seemed to bring at least one new crisis, encompassing everything from an eviction action being pursued by the lessor of the company's New York offices at 330 Madison Avenue, to the government of Bolivia moving to nationalize a power company partially held by Baldwin.

The Debtors' difficulties were not limited to creditor onslaughts. In the spring of 1983 the SEC commenced a massive investigation of Baldwin's affairs. Subpoenas were issued requiring the production of hundreds of thousands of documents scattered all over the country. "Interviews" were sought of 18 present and former employees and additional interviews as well as document requests were anticipated as the investigation progressed.

Because of the drain on the companies' meager energies and resources flowing from this investigation, and because of the substantial duplication between this investigation and the one being conducted by the Court-appointed Examiner, Debevoise & Plimpton brought an unprecedented adversary proceeding in this Court seeking to enjoin the SEC from continuing its investigation pending the completion of the Examiner's investigation and report. While a temporary restraining order was issued against the SEC, ultimately the parties

reached a settlement which narrowed the investigation but allowed it to proceed.

Overarching all of these problems was the activity of the insurance rehabilitation courts and the insurance rehabilitators. It was clear early on that if the SPDA holders were to recover 100% of their premiums, a cooperative effort among the Debtors, the rehabilitators, the state insurance guaranty funds, and the entire life insurance industry would be necessary to make up for the over $700,000,000 deficit in the SPDA companies' reserves. The signs of such a cooperative effort, however, were excruciatingly slow in arriving. Initially, tremendous pressure was applied to the rehabilitators to liquidate the companies, notwithstanding the losses which such a liquidation would mean to the SPDA holders, and notwithstanding that such a liquidation would effectively liquidate the Debtors as well, resulting in no recovery to the creditors.

The grim spectre of liquidation was averted by the filing of a rehabilitation plan in October of 1983, which was subsequently adopted by the rehabilitation courts in March of 1984. Among other things, that plan called for a 42–month moratorium on SPDA redemptions, with a provision allowing policy holders to borrow up to 75% of the amount of their premiums. It also established a 50–member Master Commission composed of representatives of the Debtors; insurance commissioners of Arkansas, Indiana and Wisconsin; the Balunit banks; and other creditors whose task it was to restructure and sell MGIC.

Unfortunately for the Debtors, it also called for a range of crediting rates averaging about 5.5%. Given the $700 million "black hole" in the reserves, as well as the questionable value of the affiliate assets, such a crediting rate could not be achieved without significant additional contributions to the reserves from the Debtors' assets. Equally detrimental to the Debtors was a provision continuing the stay of all proceedings affecting the assets held by the rehabilitators. Given this effective ouster of the bankruptcy court's jurisdiction, as well as the high crediting rate, the Debtors were forced to contest the plan. In turn, the rehabilitators, with renewed vigor, laid claim to what few assets the Debtors held which were not already trapped in the rehabilitation proceedings, including the Colorado bank partnership in which they held a special series of preferred stock.

With battle lines clearly drawn, on the morning of January 30, 1984 the Debtors countered these assertions with an adversary proceeding (which was filed under seal) seeking the recovery of $1.2 billion in preferences and fraudulent conveyances arising out of the prepetition transfers of affiliate assets to the SPDA subsidiaries. In order to avert the litigation version of a nuclear meltdown, counsel for the Debtors and rehabilitators reached a standstill agreement which stayed the parties' pursuit of their claims against one another, and provided a procedure for resolving the inherent jurisdictional conflict between the rehabilitation court and this Court.

Management and counsel for the Debtors, having reached an uneasy truce with their major creditors, and with limited cooperation from the rehabilitators, launched an aggressive plan to dispose of unnecessary or burdensome assets before their values were further impaired by the parents' Chapter 11 proceedings. Not surprisingly, this process was considerably more difficult than normal due to the crazyquilt structure of the holding companies in the system, the tangled structure of the assets themselves, and the tentacles of ownership interests attached to both. While the unwinding and sale of the Colorado bank limited partnership is the most obvious example of the Baldwin style of doing business (*In re Baldwin–United Corp.*, 43 B.R. 888 (Bankr.S.D.Ohio 1984)), it was exceptional only in its size rather than its complexion. Nearly every single transaction presented to this Court bore the Thompson insignia of undue complexity. Two examples will serve to illustrate this point. In February of 1984, the Debtors filed a motion to approve the sale of Baldwin Piano and Organ Company ("BP & O") to a group of former Baldwin executives. As best as anyone could determine, BP & O was owned by Baldwin Holding Company, which in turn was held by S & H Group, Inc., which was

held by B–U Acquisition Corporation, which was held by NIPIC, which was held by DHB, which was held by BU. NIPIC also held an issue of preferred stock in BP & O, and Prudential Insurance Company of America held a $46 million claim against Baldwin Holding Company.

Certain of BP & O's assets which were essential to the conduct of its business were held by other Baldwin entities. DHB held certain patents and an ownership interest in a German piano company; Baldwin–United Leasing Company, a defunct leasing subsidiary of BU which filed a voluntary Chapter 11 petition shortly after BU and DHB, owned BP & O's Fayetteville, Arkansas plant and was lessor of BP & O's headquarters in Cincinnati; Baldwin Finance Company, a direct subsidiary of DHB which operated as BP & O's consumer finance company, held certain receivables and debts; and NILIC held stock in a BP & O affiliate. Trying to value these assets for purposes of distributing the $53.35 million in cash from the sale was problematical both for the Debtors and for the committees, but negotiations on the sale finally culminated in this Court's approval on May 8, 1984.

Several days later, counsel for the Debtors learned of a new problem involving a Mexican subsidiary which manufactured component parts for BP & O. DHB held the stock in this subsidiary until the peak of Baldwin's cash crunch which occurred in March of 1983, when it was sold to BP & O for about $4 million. Not only was no written contract executed for this sale, but the stock transfer failed to comply with two key provisions of Mexican law. The Debtors had to hire Mexican counsel to straighten out the legal mess, resulting in a proposal, in essence, to have BP & O repurchase the stock from DHB for $2.68 million out of the sale proceeds, transfer the stock to the sellers, and file an unsecured claim against DHB for the $4 million previously paid. Over Prudential's objections, this Court approved the proposal so that the sale could be consummated, but ordered the $2.68 million to be put into escrow pending an evidentiary hearing on which entity should be entitled to this portion of the proceeds. Some six months later, the dispute with Prudential was finally compromised.

Another imbroglio generated by one of Thompson's scrambles for cash involved four warehouses and a parcel of real estate owned by S & H. As a part of his effort to finance the purchase of MGIC, in June of 1982 Thompson approached George Strike, a friend and business associate, about purchasing these properties from S & H and holding them until a syndication could be formed to resell them. On June 22, 1982 an agreement was struck whereby Strike would purchase the properties for $24,000,-000 and lease them back to S & H. The financing for Strike's purchase of three of the properties was provided by NILIC, Baldwin Finance Company and National Farmers Union Property and Casualty Company, a subsidiary of MGIC Indemnity Corporation which was held by MGIC Investment Corporation. The lease payments on the properties were sufficient to cover the mortgage obligations incurred by Strike, and Strike was paid a $100,000 fee for taking on the mortgage obligations. Strike was given the right to put the properties back to Baldwin at any time between December 22, 1982 and June 22, 1983, and DHB was entitled to call the properties during this same time. Finally, Baldwin agreed to indemnify Strike for any costs or attorney fees resulting from Baldwin's failure to perform under the put agreement.

On June 16, 1983 Strike exercised his put, but DHB was unable to perform. It took almost exactly two years of arduous negotiations before the parties finally reached an agreement for marketing and repurchasing the warehouses.

These illustrations of the difficulties in disposing of assets and attendant liabilities are hardly exhaustive. Despite the problems, by the end of 1984, the Debtors had completed at least seven major asset transactions, and dozens of minor sales ranging from automobiles to a hog confinement barn.

While these dispositions generated hundreds of millions in cash, the Debtors' abili-

ty to use this cash to reorganize continued to be roadblocked by the rehabilitators' claims to it. Indeed, their proofs of claim filed at the end of September, 1984 aggregated more than $4 billion dollars. Among other allegations under state and federal law, they asserted that all funds obtained by the Debtors from the SPDA companies were held in a constructive trust, and that the SPDA companies had an equitable lien on those funds. Assuming they prevailed on those claims, they would have been entitled to virtually every asset in the estate. Even MGIC was not immune, since the rehabilitators later filed suit in Arkansas against the Balunit banks seeking damages and asserting that a constructive trust should be imposed on the company's stock and assets in favor of the SPDA holders.

Compounding these potential liabilities was at least $3.2 billion in contingent claims filed by state insurance guaranty funds from all over the country. Many, if not most, of those claims asserted rights of subrogation on all of the theories of recovery in the rehabilitators' claims. Guaranty liability had already been triggered as to certain of those funds.

In the meantime, a movement was afoot within the life insurance industry led by Metropolitan Life Insurance Company, as well as the securities brokerage industry, to put together an enhanced rehabilitation plan which would raise the crediting rate on the SPDAs from 5.5% to at least 7.5%. This effort was motivated not only by a desire to salvage the reputation of SPDAs as an investment vehicle, but also to make the SPDA holders whole and thus eliminate damage claims in the many suits filed against the brokers who sold SPDAs. Forty of those cases had been consolidated in the United States District Court for the Southern District of New York, and came to be known as MDL 581, (The Honorable Charles Brieant presiding); *In re Baldwin– United Corporation Litigation,* 581 F.Supp. 739 (J.P.M.L.1984). Any commit-

ment to such a plan, financial or otherwise, was initially contingent upon a resolution of the dispute between the rehabilitators and the Debtors. If this could not be accomplished by early 1985, the possibility of an enhancement plan was threatening to evaporate.

While the parties had already expended a great deal of effort toward settling, at the end of November, 1984 both the Debtors' counsel (in consultation with committee counsel and other case professionals) and rehabilitation counsel undertook this Herculean task with a vengeance. A few days after two all day and all night meetings on November 15 and 16, the parties informed the Court that they had reached an agreement on all substantive issues. A final draft was completed by mid-December, but due to certain political pressures in Arkansas, was not executed until mid-January, 1985.[2]

While the settlement was quite intricate, its major feature required the Debtors to pay the rehabilitators $170,000,000, which was adjustable based on the occurrence of certain events. In exchange, the affiliate assets were to be returned to the Debtors. The swap of cash for assets would take place upon confirmation of a plan of reorganization, which had to occur no later than April 15, 1986.[3] The agreement could be terminated unless the Debtors: 1) sold MGIC and certain other assets; 2) settled claims asserted by the Internal Revenue Service; and 3) resolved the Balunit banks' claims to Balunit and MGIC. Since a confirmable plan could not be formulated unless these conditions occurred, they too had to be accomplished by April 15, 1986.

The Debtors, with full cooperation and support from their committees, launched a drive to fulfill this seemingly impossible agenda of commitments. First on the list was the sale of MGIC. The marketing of this asset was complicated by the usual

---

**2.** Despite Leucadia's allegations to the contrary, the Court's involvement in bringing about this settlement was largely limited to a 15–minute meeting in Dallas where, at the climax of what can only be described as a month-long high

melodrama, the agreement was signed by all parties.

**3.** Originally the date was January 15, 1986, but was later extended by agreement.

problems in marketing any Baldwin asset: eclectic corporate structure, ownership tentacles, and serious tax implications. The size of the company as well as a flat housing market added to the problem. After a disheartening sale by sealed bid, (at which no bids were presented), in late 1984 Northwestern Mutual Life Insurance Company agreed to purchase MGIC Investment and certain of its subsidiaries, and the sale was consummated on February 28, 1985.

The volumes of sale documents disclose an incredibly arcane intermeshing of reserves and assets, payment of ceding commissions by foreign reinsurers in exchange for MGIC's book of residential mortgage insurance, and transfer of tangible assets. Because the value of the liabilities being assumed by Northwestern exceeded the assets, no cash was paid in the transaction. The value realized on the sale was to flow from MGIC's remaining assets less unassumed liabilities. This figure was initially estimated to be $740,000,000. The administration of these assets, as well as the claims against them, is being conducted in insurance liquidation proceedings in Wisconsin, and continues to this day.[4]

The Debtors next turned their attention to the claims of the IRS, which were probably the most awe-inspiring and nettlesome of the obstacles to their reorganization effort. The ten proofs of claim sought over $450 million arising out of thousands of transactions dating back as far as 1971.

The IRS and Department of Justice's Tax Division initially took the approach of resolving these claims on a piecemeal basis. During a May, 1984 pretrial conference on a tax case which the District Court referred here for trial, the IRS and Justice attorneys estimated that it would require at least two to three years to finish the audits of the Debtors' returns, which were completed only through the late 1970s. Had the government continued to pursue this approach, it is not far-fetched to assume that a final resolution of all of its claims would have cost the Debtors (not to

mention the government) millions of dollars in attorney and accountant fees and would have taken at least a decade.

While this deliberate pace may have been acceptable to the agencies involved, it was entirely unacceptable in the context of this case, where 165,000 SPDA holders, 20,000 common stockholders, and thousands of other creditors, most of limited means, were in desperate need of recovery.

On March 28, 1985 this Court held a status conference on the tax claims and urged the government to adopt a macro rather than a micro approach in resolving its claims. Counsel for the IRS and Tax Division expressed support for this approach, and stated that they were committed to settling all tax issues involved within 30 to 60 days.

The Court indicated that if the parties could not reach a settlement within that time frame then estimation hearings pursuant to 11 U.S.C. § 502(c)(1) as to all tax claims would commence promptly thereafter.

Four weeks of arduous negotiations followed resulting in a reduction of the tax issues from scores down to twelve. With the parties' consent, on May 2 the Court convened a settlement conference at which persons with full settlement authority were to be in attendance. At the commencement of that conference the Court was surprised to learn that a settlement proposal by the Debtors on all twelve issues had been on the table for at least a week, but the government had made no response. The government spent much of the remainder of that day analyzing reams of figures, putting together a counterproposal and negotiating further with counsel for the Debtors.

Late in the afternoon of the following day, the parties reached what was thought to be a settlement on all tax issues up to December 31, 1985. Counsel for the Tax Division stated that the agreement was a recommendation which his supervisor had cleared, but that approval of that recom-

---

**4.** In an equally complicated series of transactions, American Municipal Bond Assurance Corporation, a major subsidiary of MGIC, was sold for approximately $127,000,000 in April of 1985, and the distribution of these proceeds is also pending in Wisconsin liquidation proceedings.

mendation would be forthcoming by no later than May 9.

Events in MDL 581 had made the timing of such approval by the IRS critical. A settlement had been reached in that action whereby some 18 brokers had agreed to pay $140 million. On May 1, 1985 Judge Brieant approved the settlement, and held that the proceeds could be paid into an SPDA enhancement plan if such a plan could be put together by no later than May 15, 1985. *In re Baldwin–United Corp.*, 607 F.Supp. 1312, 1331–32 (S.D.N.Y.1985) If no plan were devised, then the money was to be paid to the class of 99,000 SPDA holders, leaving the remaining 66,000 with no hope of full recovery. Unless the Debtors reached a settlement with the IRS, no plan was possible. The Debtors' $450 million potential liability to the IRS made it impossible for them to commit to paying their $170 million contribution into the plan. Even if they could, the plan proponents were insisting on a complete release from the IRS as to all transferee liabilities.

What this Court and the Debtors considered to be a binding commitment from the government subject to routine approval turned out to be nothing more than an invitation to raise additional issues, make new demands, and erect new hurdles to cross. Early in the week of May 5, the Court was informed that the IRS hierarchy had not only not approved the Justice Department's recommendation, it had rejected it and made a new proposal. Counsel for the Debtors analyzed this proposal and agreed to it. Two weeks later, the review section of the Tax Division pronounced that the IRS proposal was unacceptable. The government then put forth a new proposal which was contingent upon approval by both the Deputy Attorney General and the Joint Committee on Taxation of the U.S. Congress. Such approval was to take another 60 days.

The disastrous consequences which could have resulted from this maddening bureaucratic display were averted through a number of continuances in the May 15 deadline set by Judge Brieant. Some four months later this Court approved an agreement which provided, among other things, for a lump sum payment of $50 million to the IRS, a net operating loss carryover cap of $350 million, and a complete release of all tax liabilities for Baldwin–United, its consolidated and nonconsolidated subsidiaries, its transferees and successors.[5]

With two of the three major roadblocks to reorganization swept away, the Debtors' tentative proposals for a plan began to crystallize. After literally hundreds of hours of negotiations with the creditors' and common stockholders' committees, and hundreds more in drafting, in late August, 1985 the Debtors filed a disclosure statement and plan. An amended disclosure statement and plan was subsequently filed on September 18, 1985.

The plan called for the reorganization of the company around the two largest companies still held by the Debtors, Sperry & Hutchinson and another trading stamp company, Top Value. The new company's assets would also include life, commercial loan and property and casualty insurance subsidiaries. Immediately after the effective date of the plan, the Debtors and 97 of their subsidiaries would be rolled up into a new corporation known as PHLCORP, Inc.

---

**5.** Notwithstanding this release, Baldwin's problems with the IRS were reignited during a 1985 audit of the Kroger Company. Baldwin and Kroger were joint owners of a corporation known as Kroco, Inc. Without elaborating the details, suffice to say that this was a classic Thompson arrangement. It included a tax allocation agreement between Baldwin and Kroger, as well as an agreement by Baldwin to indemnify Kroger should Kroger be required to pay additional taxes as a result of Kroco. Kroger held $17.7 million in tax allocation payments which Kroco owed to Baldwin. The IRS asserted that all of Kroco's income should have been reported by Kroger, and Kroger was threatening to trigger its right to indemnification, including $10 million in letters of credit which Baldwin had obtained to back its promise.

Baldwin filed an adversary proceeding against the IRS to enjoin it from asserting its claim against Kroger. Because Kroco was a part of Baldwin's consolidated returns, the settlement agreement covered all such claims, Baldwin's returns were deemed accepted as filed, and the IRS had full knowledge of the Kroco arrangement, the injunctive relief was granted. *See*, Adversary No. 1–86–0023.

Because of the many contingencies which still confronted the Debtors, the plan itself was contingent. It provided for payments to unsecured creditors of cash, zero coupon notes, and common stock with a projected recovery in the range of 25 cents to 35 cents on the dollar. Interest holders were to receive common stock and warrants to purchase additional shares, with approximately 12% of the stock in the new company to go to Baldwin's common stockholders.

The cash payments, which were to be made through a liquidating trust, were conditioned upon the plan becoming effective. This could only occur if the conditions in the settlement agreement with the rehabilitators were fulfilled, payments pursuant to the tax settlement and other settlements were made, and $70 million in unrestricted cash was available after a set aside of $25.5 million for administrative priority claims.

While the Debtors' amended disclosure statement was approved by this Court on October 1, it was obvious to everyone that serious obstacles to the Debtors' ability to reorganize remained to be overcome. Chief among them was the Balunit banks' claims to the MGIC proceeds.

These negotiations were complicated not only by the enormity of the banks' claim (which they asserted to be close to $560 million), but also because of the number of participants involved and the competing claims at stake. Agreement from the banks on a dollar amount was contingent upon a full resolution of an adversary proceeding pending in this Court against the Wisconsin rehabilitator seeking $250 million from the MGIC sales proceeds in reimbursement for taxes previously paid by Baldwin on MGIC's behalf pursuant to a tax allocation agreement between the two. It was also contingent upon a resolution of the Arkansas rehabilitator's $1 billion lawsuit against the banks, which was proceeding in high gear, as well as certain counterclaims filed by the Indiana rehabilitator to the banks' claims in the Wisconsin litigation. In addition, the Debtors were threatening to file a fraudulent conveyance suit against the banks, and to add them as a party in a RICO suit which they had filed against Merrill Lynch, the Debtors' investment banker for the MGIC purchase.

Ultimately, the problem boiled down to not enough dollars to satisfy rigid demands. The Debtors were caught between the Balunit banks' demands for nearly full payment, including lost opportunity costs; the rehabilitators' need for no less than $170 million to satisfy the state guaranty funds and to make the enhancement plan achievable; the IRS, which would not provide releases until its $50 million was paid; and their own creditors, whose expectations for a significant recovery had risen as intensive negotiations over a plan as well as settlements with major claimants had transpired. These problems were compounded by an unexpected increase in claims against both the MGIC and AMBAC liquidation funds, including a $56 million claim by MGIC's purchaser, Northwestern Mutual. It was further complicated by substantial uncertainties over the total dollar amount of claims, which would have to be dealt with in the Debtors' estates, including close to $1 billion in claims for indemnification filed by the SPDA brokers.

Notwithstanding these difficulties, over the course of two difficult bargaining sessions in September and October, 1985, the parties were able to reach an agreement calling for a payment of $520 million to the Balunit banks to be paid by December 31, 1985, with the potential for a greater recovery depending on how matters proceeded in the Wisconsin liquidation proceeding. In addition, the parties agreed to release all claims against one another, and agreed to make a joint effort to persuade the Wisconsin liquidator to release sufficient funds to cover the payment. The Debtors and rehabilitators agreed to engage in further negotiations to eliminate the contingencies in their settlement agreement and arrive at a lump sum "walk-away" payment.

While this arrangement sounded simple enough, it required another two months of negotiations among the Debtors, Balunit banks, creditors' committees, rehabilitators, IRS and the Wisconsin liquidator

before a final agreement was executed. That agreement, which was some 55 pages long plus attachments, provided an intricate framework for the timing of payments and the execution of releases as to all parties. The banks were paid their $520 million by the end of 1985, and both the rehabilitators and the IRS were paid by early 1986.

In the midst of these settlement negotiations, the pursuit of their asset disposition plan, and plan negotiations with their creditors, the Debtors were confronted with some 8200 other claims totalling over $23 billion which had to be resolved as a prerequisite to reorganizing. Not the least of these were the indemnification claims filed by nearly all of the defendants in MDL 581. In February of 1985, Paine Webber Group, Inc. filed a third-party indemnification claim against Baldwin–United in one of the suits consolidated in MDL 581. What transpired thereafter was a tempest of litigation in two District Courts, the U.S. Court of Appeals for the Second Circuit, and this Court regarding the applicability of the automatic stay as to the brokers' indemnification claims as well as the merits of enjoining the pursuit of those claims. Ultimately, the Debtors prevailed on both points. *See, In re Baldwin–United Corp.,* 48 B.R. 901 (Bankr.S.D.Ohio 1985); *In re Baldwin–United Corp. Litigation,* 765 F.2d 343 (2d Cir.1985); *In re Baldwin–United Corp.,* 57 B.R. 759 (S.D.Ohio 1985). Thereafter, this Court found the brokers' claims to be legally invalid, and alternatively estimated them at $0. *In re Baldwin–United Corp.,* 55 B.R. 885 (Bankr.S.D.Ohio 1985) Five days after the entry of this decision, this Court held a conference attended by representatives of the SPDA holders, brokers, Debtors, rehabilitators, and committees. After day-long negotiations, a settlement was reached on the brokers' indemnification claims. In addition, the Debtors and Merrill Lynch were able to reach an agreement disposing of the Debtors' lawsuit against Merrill Lynch, and Merrill Lynch's $75 million claim against the Debtors.

With the compromises which were subsequently reached with Prudential on its $46 million claim against Baldwin Holding Company, the securities fraud class claimants, and Frank McCullough, who held a $20 million personal injury judgment against S & H's parent, B–U Acquisition Group, Inc.,[6] by March of 1986 the Debtors and professionals could say for the first time in the history of these cases that a successful reorganization was more probable than not.

Apparently the financial marketplace was also aware of the probabilities of the Debtors' successful emergence from Chapter 11. Beginning in January of 1986 a market suddenly developed in the purchase and sale of Baldwin creditors' claims. By the end of February most of the largest unsecured bank creditors had sold their claims and resigned from the BU and DHB creditors' committees. To a large extent, counsel for the committees were required for a time not merely to render legal advice to the committees, but in effect carry out the committees' fiduciary duties to their constituents. Eventually, the two committees merged and new members were found.

On February 10, 1986 the Debtors filed a modified plan and disclosure statement which reflected the settlement reached with the Balunit banks, the new arrangement for cashing out the rehabilitators, as well as other developments. None of the votes on the previous plan, which had received over 95% approval, changed as to the modified plan, and on March 13, 1986 this Court confirmed Baldwin's proposed plan of reorganization.[7]

By the end of October, 1986 almost every one of the 108 contested matters and 24 adversary proceedings which had been filed in these cases had been resolved and the plan was ready to become effective. A last burst of frantic activity occurred in these proceedings on November 13, 1986, when

---

**6.** The threat to execute on this judgment and the resulting adverse impact on S & H which might have resulted forced management to put B–U Acquisition Group, Inc. into a voluntary Chapter 11 proceeding on March 22, 1985.

**7.** B–U Acquisition Group's plan was subsequently confirmed on September 26, 1986.

Leucadia National Corporation sought and obtained approval for the transfer of some $107 million in claims. With close to 40% voting control in the company and a 57% interest in the liquidating trust, in March of 1987 Leucadia's principals voted themselves in as the new management of PHLCORP.

## II. Fees Sought Under Section 503(b)(3) and (4)

With the above narrative as an essential backdrop, we turn to the applications brought under 11 U.S.C. § 503(b)(3) and (4). Of the six applications, five are brought pursuant to § 503(b)(3)(D), which allows a payment for "actual, necessary expenses" to, among others, creditors and indenture trustees "in making a substantial contribution in a case under Chapter 9 or 11 of this title." The sixth application is brought under § 503(b)(3)(A), which allows a creditor to be reimbursed for actual, necessary expenses in filing an involuntary petition under § 303. All six applications seek reimbursement for attorneys fees pursuant to § 503(b)(4) which allows reasonable compensation for the attorneys and accountants of those who qualify for reimbursement of expenses under § 503(b)(3).

While the standards for awarding expenses under § 503(b)(3)(A) and § 503(B)(3)(D) (and concomitant fees under § 503(b)(4)) differ, all applicants under § 503(b) have the burden of establishing their entitlement to an award by a preponderance of the evidence. *In re 1 Potato 2, Inc.*, 71 B.R. 615, 618 (Bankr.D.Minn.1987); *In re S & T Industries, Inc.*, 63 B.R. 656, 657 (Bankr.W.D.Ky.1986). The statute itself "must be narrowly construed, in order to keep fees and administrative expenses at a minimum so as to preserve the estate for the benefit of all its creditors." *In re O.P.M. Leasing Services, Inc.*, 23 B.R. 104, 121 (Bankr.S.D.N.Y.1982), *quoted in In re Baldwin–United Corp.*, 43 B.R. 443, 451 (S.D.Ohio 1984); *see also, In re Hearth & Hinge, Inc.*, 28 B.R. 595, 596–97 (Bankr.S. D.Ohio 1983). The requirements for documenting how time was spent are no less applicable to fee applications and time sheets being judged under § 503(b) than

they are for applications under § 330. *See, In re Paolino*, 71 B.R. 576, 581 (Bankr.E. D.Pa.1987).

This Court has previously set forth the prerequisites for time to be included in the lodestar calculation of number of hours times a reasonable hourly rate:

> Time records which merely note that a telephone call took place or that a conference was held will be deemed insufficient. At a minimum, time entries for conferences and telephone calls should identify who was spoken to and specify what was discussed. If research was performed, a description of the research should be given. Time entries for drafting documents should specify the document involved.

*In re Baldwin–United Corp.*, 45 B.R. 381, 382 (Bankr.S.D.Ohio 1984).

With these general guidelines in mind, we next consider the specific applications at issue.

### A. *The Application of First Interstate Bank of Oregon for Expenses and Fees Under § 503(b)(3)(A) and § 503(b)(4).*

First Interstate Bank of Oregon ("First Interstate") seeks $68,982.75 in fees and $6,634.47 in expenses arising out of the filing of the September 26, 1983 involuntary petitions against BU and DHB. First Interstate's application includes the work of three separate law firms. The joint unsecured creditors' committee, the common stockholders' committee, and Leucadia have all objected to this application as being excessive for three principal reasons: first, they assert that First Interstate is only entitled to fees and expenses incurred in the actual preparation and filing of the involuntary petitions and that its application goes beyond this limitation. Second, they assert that the application must be substantially reduced due to the duplication of effort by the three law firms employed. Finally, they note that many of the time entries contain insufficient detail. A document entitled "Executive Management's Recommendations", was prepared in response to each application before us by

Victor Palmieri and Peter Martosella, PHLCORP's former management, with the assistance of Robert J. White of O'Melveny & Myers. The recommendation of management concurs with these assertions, and suggests that First Interstate be awarded a total of $4000.

While we largely agree with the objectors' observations about the quality of this application, we take a somewhat different view of the law. The established rule under the Bankruptcy Act of 1898 was as stated by the objectors: only services actually rendered in preparing, filing and prosecuting an involuntary petition were deemed reimburseable. The expense of all other services was to be borne by the petitioning creditors, not the estates. *Calhoun v. Stratton,* 61 F.2d 302 (6th Cir.1932); *In re Consolidated Factors Corp.,* 59 F.2d 193 (2d Cir.1932); *Morse & Tyson v. Irving–Pitt Mfg. Co.,* 18 F.2d 692, 695 (8th Cir. 1927). While the few cases which have interpreted § 503(b)(3)(A) have generally followed the view taken under the Act, they have done so with little supporting analysis. *See, In re J.V. Knitting Service, Inc.,* 22 B.R. 543, 545 (Bankr.S.D.Fla.1982); *In re Seatrain Lines, Inc.,* 21 B.R. 194, 195 (Bankr.S.D.N.Y.1982).

To the extent that the rule under the Act limits attorneys' fees *solely* to time spent in writing and filing the petition, we conclude that it is out of step with the realities of practice under 11 U.S.C. § 303. While this section largely tracks the provision of § 59 of the Act, section 303(i) had no counterpart under the former law. This section authorizes an award of costs and attorneys fees against the petitioning parties if the petition is dismissed other than by consent. It further authorizes punitive damages if the petition is filed in bad faith.

■ Given these provisions, given the size and intricacies of the Baldwin structure, and given the real possibility of encountering significant resistance, no creditor with any sense would file an involuntary petition against any of the Baldwin entities without first doing a significant amount of legal and factual research. In the absence of any indication that the drafters of the Code intended § 503(b)(3)(A) to be a second deterrent to the filing of an involuntary petition over and above the provisions of § 303(i), we conclude that expenses and attorneys fees arising from a reasonable amount of research and investigation prior to preparing and filing the petition should be allowable.

■ Even under this more liberal standard, however, most of the expenses and fees for which First Interstate seeks reimbursement cannot be allowed. Of the $26,-343.73 sought for the work of Tonken, Torp, Galon, Marmaduke & Booth of Portland, Oregon, we have identified $11,610 in time entries which are inadequately described, refer to matters extraneous to the filing of the petitions, or are excessive given the tasks performed. Some $15,673.50 of the time entries of Keck, Mahin & Cate of Chicago, Illinois are not allowable for the same reasons. The $10,705 charged by Smith & Schnacke of Cincinnati, Ohio is not only inadequately described, but contains no time entries, and thus will be denied in its entirety. Tonken, Torp spent $11,444.50 to do factual and legal research into the filing of the petitions and the consequences thereof. Keck, Mahin spent another $6,144 doing the exact same research. Much of the research time of both firms was spent revising and redrafting a memo and brief, neither of which was ever filed.

An additional deduction is warranted by the fact that the petitions were initially prepared at the end of the April standstill, but were not filed when a second standstill agreement was put into place in June. This resulted in additional research, conferencing, and other work done on a second set of petitions which were eventually filed in September.

Most of the remainder of the time reflected in all three sets of time sheets consists of telephone calls and conferences within and among all three firms as well as with other creditors and Baldwin. While these calls appear to be related to the involuntary filing, we do not believe that the estates should bear the burden of paying for all of them.

As for expenses, approximately one-quarter of the $6,634.47 sought was for local and out-of-town travel, including a trip to Cincinnati to meet with other creditors. Much of the rest of it was for photocopies and air freight, but no explanation is provided concerning the need for these inordinate charges.

Upon reviewing the time sheets and making appropriate deductions, the Court finds that an award to First Interstate of $20,000 in fees and $1,000 in expenses represents a reasonable and appropriate lodestar amount.

## B. The "Substantial Contribution" Applications.

Before reviewing the merits of each of the five applications brought under § 503(b)(3)(D) and the objections thereto, we must first grapple with the meaning of "substantial contribution." While the caselaw is still evolving, some basic parameters for this nebulous concept are fairly definite.

Section 503(b)(3)(D) has its roots in §§ 242 and 243 of Chapter X of the Bankruptcy Act. As was true of those predecessor statutes, § 503(B)(3)(D) was intended to stimulate and encourage meaningful creditor participation in reorganization proceedings. *See, e.g., In re Rockwood Computer Corp.*, 61 B.R. 961, 964–65 (Bankr. S.D. Ohio 1986). Tension exists, however, between the need to interpret this statute broadly to effectuate its purposes, *In re Russell Transfer, Inc.*, 59 B.R. 871, 873 (Bankr.W.D.Va.1986), and the requirement that administrative expenses of the estate be kept to a minimum, *In re Baldwin–United Corp.*, 43 B.R. 443, 451–52 (S.D. Ohio 1984).

While it has been stated that a substantial contribution consists of services which "foster and enhance, rather than retard or interrupt the progress of reorganization," *In re Richton Int'l. Corp.*, 15 B.R. 854, 856 (Bankr.S.D.N.Y.1981), recent caselaw indicates that this is a mere starting point for determining whether services are compensable under the statute. Among the

factors most often considered are the following:

1) Were the services rendered solely to benefit the client, or to benefit all of the parties to the case? *In re General Oil Distributors, Inc.*, 51 B.R. 794, 805 (Bankr.E.D.N.Y.1985) ( . . . [A]n incidental benefit to the estate or the estate's creditors will not provide the basis for an award from the estate. For example, such nonreimburseable services undoubtedly include those rendered in prosecuting a creditor's claim.); *see also, In re Ace Finance Co.*, 69 B.R. 827, 829 n. 1 (Bankr.N.D.Ohio 1987); *In re Rockwood Computer Corp.*, 61 B.R. 961, 966 (Bankr.S.D.Ohio 1986).

2) Did the services provide a direct, significant and demonstrable benefit to the estates? *In re Consol. Bancshares, Inc.*, 785 F.2d 1249, 1252–53 (5th Cir. 1986); *In re Jensen–Farley Pictures, Inc.*, 47 B.R. 557, 569 (Bankr.D.Utah 1985); *In re Calumet Realty Co.*, 34 B.R. 922, 926 (Bankr.E.D.Pa.1983).

3) Were the services rendered duplicative of services rendered by attorneys for the committee, the committees themselves, or the debtor and its attorneys? *In re Rockwood Computer Corp.*, 61 B.R. 961, 966 (Bankr.S.D.Ohio 1986).

The imprecision of these terms reflects the inherent imprecision of the inquiry generally. Ultimately, what constitutes a substantial contribution must be left to the informed discretion of the Court based upon the time sheets and other relevant evidence, to which we now turn.

### 1. First National Bank of Chicago.

As noted in the narrative above, First National Bank of Chicago was the indenture trustee for BU debentures issued in connection with DHB's limited partnership interest in Central Colorado Company, which held Central Bancorporation, Inc. The application seeks fees of $195,843.40 for Caifee, Halter & Griswold, $29,684 for in-house counsel, $14,250 in administrative charges for services by the bank's corporate trust department, and $4,923.50 in fees

for Philadelphia Insurance Research Group, a consultant retained by the bank.

First Chicago bases its request for reimbursement of these fees and expenses on its role as an ex-officio nonvoting member of the BU creditors' committee. It claims that it was instrumental in the formation of the committee and in writing its rules of procedure. It also claims that it was instrumental in garnering approval among the debenture holders of the Ameritrust proposal to buy DHB's partnership and retire the debentures. Finally, it asserts that it acted as a voice for the debenture holders and allowed the Debtors to deal with them as a group.

None of the evidence supports these assertions. The time sheets of Calfee, Halter & Griswold and of in-house counsel largely reflect the performance of typical creditor committee functions, primarily telephone calls and conferences with other committee members. Although the bank claims that Victor Palmieri asked it to organize a creditors' committee, Palmieri had no recollection of making such a request. (Tr. of April 7, 1987 at 169). While Calfee, Halter did prepare a set of committee rules, counsel for the committee subsequently prepared a different set of rules which the committee eventually adopted.

The bank's purported role as a spokesman for the debenture holders is certainly subject to question. Until they were bought out by Ameritrust, at which time their participation in the case ended, many of the debenture holders appeared and were heard at status conferences in these cases. On many occasions they were not merely at odds with First Chicago, but stood in an adversarial posture with the bank. Indeed, at one time or another the bank seemed to be in an adversarial relationship with virtually everyone in this case, including the BU creditors' committee. To the extent it played a leadership role, it was usually leading the charge against the Debtors, rather than leading its constituents in constructive attempts to consensually resolve the multitude of problems surrounding the conflicting interests in the Colorado banks.

In sum, the record establishes that First Chicago from the outset embarked upon a campaign to fight its way out of these cases, and to do so as quickly as possible regardless of the consequences to the Debtors or their reorganization effort. While it does not seek reimbursement for the cost incurred in pursuing this strategy, we cannot ignore its litigious posture and the hundreds of thousands of dollars which it cost the Debtors' estates in fees and expenses. Likewise, while the services of First Chicago's attorneys and consultant may have benefited the bank, they certainly did not "foster and enhance, rather than retard and interrupt, the progress of reorganization." *In re Richton Int'l. Corp.*, 15 B.R. 854, 856 (Bankr.S.D.N.Y.1981). Having failed to meet even the threshhold requirement for finding substantial contribution in the case, First Chicago's application is denied in its entirety.

### 2. *IBJ Schroder Bank & Trust Company.*

█ IBJ Schroder Bank & Trust Company ("Schroder") is a successor indenture trustee for two BU securities: 9¼% subordinated installment notes due in 1994 and 10% subordinated debentures due in 2009. The total debt outstanding on these issues was $21.4 million. The bank took over this position from Chemical Bank–Delaware, which found it necessary to resign as indenture trustee on November 30, 1983. Schroder seeks reimbursement for fees of $486,252.10 and $63,543.30 in expenses paid to its counsel Rosenman & Colin; $42,812.50 in fees and $1,395.88 in expenses for local counsel Faulkner & Tepe; $69,012.50 in fees and $3,513.63 in expenses for its financial advisor, S.N. Seidman & Company, Inc.; and $63,543.30 in fees and $5,643.30 in expenses incurred by the bank. Former management has recommended that Schroder should be reimbursed for $325,000 of the amount claimed. Leucadia objects to the application in its entirety, while AmeriTrust, another committee member, objects to it in part.

Schroder asserts that it made a substantial contribution to this case by serving as

the sole representative of BU's subordinated debt in its capacity as an ex-officio, nonvoting member of the BU creditors' committee. As noted above, the committee was initially composed of bank creditors, Colorado debenture holders, the rehabilitators and Schroder. When the Colorado partnership was sold to AmeriTrust, the debenture holders resigned from the committee. The memberships of both creditors' committees were decimated when certain bank members' claims were purchased in February, 1986, leaving Schroder and AmeriTrust as the only remaining committee members. Both later became members of the joint committee.

There is no question that Schroder was an active and diligent member of the BU committee during the relevant period. As was true of the other members, counsel for the bank was required to review each of the innumerable matters which arose, both inside and outside of these cases. In addition to analyzing ongoing events, most of the rest of counsel's time was spent communicating with the client and counsel for the committee; researching various points relating to the trust indenture, and attending creditor committee meetings. While it performed ably for its constituents, we cannot say that these activities alone constitute a substantial contribution to the case, since they are precisely what a committee member is supposed to do under § 1103(c).

Schroder also claims to have made a substantial contribution through its opposition to the Colorado bank sale. It asserts that it provided a service to the court and other parties by raising issues and presenting opposing points of view.

We emphatically disagree with these propositions. Indeed, we were convinced then and remain convinced that Schroder's opposition to that sale was ill-conceived. In large measure, this was undoubtedly due to the fact that the attorneys who prepared and presented Schroder's case were not brought into the proceeding until the eleventh hour. Indeed, Rosenman's time sheets indicate that the attorney given principal responsibility for trying this matter first became involved on August 8, 1984, only seven days prior to the hearing on the sale, even though counsel for Schroder knew about the AmeriTrust proposal as early as June 12. Had greater time been spent analyzing the marketability of the asset, the "white elephant" nature of the ownership interest, and the risks to anyone who purchased it, we believe that the time-consuming and expensive proceedings attendant to the sale might have been avoided. *See, In re Baldwin–United Corp.*, 43 B.R. 888 (Bankr.S.D.Ohio 1984).

While we respect a creditor's right to voice opposition in Chapter 11 proceedings and recognize that prevailing in such opposition is not necessarily a prerequisite to finding substantial contribution (*In re Revere Copper & Brass, Inc.*, 60 B.R. 892, 897 (Bankr.S.D.N.Y.1986)), Schroder's opposition to the AmeriTrust transactions does not warrant such a finding. Thus, the services rendered by Rosenman on this matter are not reimburseable.

Finally, Schroder asserts that it made a substantial contribution to the case through its involvement in the negotiation, drafting and confirmation of the plan of reorganization. The time sheets of Rosenman and the testimony presented at the hearing largely support this claim. Both Messrs. Palmieri and Martosella testified that Mr. Joseph Chervin of the Rosenman firm was instrumental in mediating disputes between the senior debenture holders, subordinated debt holders and equity security holders. (Tr. of April 7, 1987 at 133–144; 167). Mr. Chervin's timesheets, as well as those of Mr. Paul Bindler, corroborate this testimony. Between May of 1985 and March of 1986 they spent some 261 hours analyzing plan proposals; meeting with management, counsel for the Debtors and the creditors' committees regarding the plan; meeting with individual creditors; attending hearings on the disclosure statement; preparing an explanatory letter to the subordinated debt holders regarding the plan; and attending meetings regarding the implications of claims transfers. While these activities might not constitute a substantial contribution in and of themselves, *In re Rockwood Computer Corp.*, 61 B.R. 961, 966 (Bankr.S.D.Ohio

1986), the timesheets and other evidence make it apparent that Rosenman's ongoing efforts to mediate disputes among the Debtors' potential adversaries and to develop a consensual plan provided a substantial benefit to all involved. Accordingly, we find by a preponderance of the evidence that Schroder should be reimbursed for Rosenman's efforts in the amount of $50,000 in fees and $8,000 in expenses.

The remaining amounts requested by Schroder must be denied for a variety of reasons. To the extent that reimbursement is sought for S.N. Seidman & Co., Inc.'s participation in the AmeriTrust transaction, such reimbursement is denied for the reasons cited above. The remainder of its services consisted of reviewing documents, attending creditor committee meetings, and rendering advice on the plan. We concur in former management's view that these services were duplicative of those provided by the Debtors' financial advisor, Goldman, Sachs, as well as the committees' financial advisor, Shearson–Lehman Brothers, Inc. Even if this were not the case, the language of § 503(b)(4) (unlike § 330(a)(1)), limits compensation to attorneys and accountants only, rather than any professional. Accordingly, reimbursement for Seidman's services must be disallowed.

As for the application of Faulkner & Tepe, our review of that firm's time sheets indicates that the services rendered were those routinely performed by local counsel. Reviewing documents and attending hearings, without more, does not rise to the level of a substantial contribution.

Finally, with the exception of an affidavit by George R. Sievers, senior vice-president of Schroder, no documentation has been presented in support of the bank's claim for internal charges of $63,543.30 in fees and $5,643.30 in expenses. The lack of any time sheets or receipts makes it impossible for us to determine how the requested fees and expenses were generated, let alone whether they constituted a substantial contribution to the case. Accordingly, this request must also be denied.[8]

### 3. *AmeriTrust Company National Association.*

■ AmeriTrust served as indenture trustee for D.H. Baldwin debentures due in 1994 held by 9696 holders in an outstanding amount of almost $103,000,000 including interest. It was a voting member of the D.H. Baldwin creditors' committee from its formation, and remains as a member of the joint committee through the present day.

AmeriTrust seeks reimbursement for payment of $91,460.18 in fees and expenses to its outside attorneys, Squire, Sanders & Dempsey; $73,278.80 in fees for its in-house counsel, Thomas J. Butler; and $9,800 in salary for Anthony Aveni, plus $7,656.13 in expenses he incurred in attending creditor committee meetings as a second committee representative for Ameri-Trust. Former management has recommended that the $182,195.11 request be allowed in the reduced amount of $125,000. Leucadia objects to the application in its entirety.

As was true of Schroder, the evidence is clear that AmeriTrust and its attorneys served its constituency with ability and professionalism. They were active participants in the deliberations and functioning of the DHB committee and the stream of problems it faced.

However, as was also true of Schroder, the evidence is less than clear that Ameri-Trust's representatives provided something more than an indirect benefit to the estates

---

**8.** In its post-hearing proposed conclusions of law, Schroder asserts for the first time that it is entitled to reimbursement of its fees and expenses under the trust indentures, citing *In re United Merchants & Mfrs., Inc.,* 674 F.2d 134 (2d Cir.1982). *See also, In re Martin,* 761 F.2d 1163 (6th Cir.1985). The question of whether an indenture trustee is entitled to reimbursement as a matter of contract is wholly separate from its entitlement under § 503(b)(3)(D) and § 503(b)(4). *Cf. In re Multiponics, Inc.,* 622 F.2d 731, 734 (5th Cir.1980); *See In re Revere Copper & Brass, Inc.,* 60 B.R. 892, 895 (Bankr.S.D.N.Y. 1986). Because this issue was not addressed prior to or at the hearing, we express no opinion as to whether Schroder or any other indenture trustee might file an unsecured, nonpriority claim for fees and expenses not awarded herein.

342

and its other creditors. For example, the evidence supports AmeriTrust's assertion that it opposed substantive consolidation of the estates (along with a number of other parties), and sought to have the issue dealt with in the plan. As the representative of one of DHB's largest groups of creditors, its opposition to substantive consolidation was understandable, since DHB held the bulk of the estates' meager assets, while BU held the bulk of the debt. However, neither the case file, nor Squire, Sanders' timesheets, nor any of the other evidence gives any indication that AmeriTrust was instrumental in bringing about an agreement to avoid what would have been an extremely time-consuming and costly battle over the issue. While we are inclined to believe that the bank's attorneys had a part in this result, our inclination is not supported by the evidence; nor can we conclude that merely having some involvement in the result is sufficient to constitute a substantial contribution.

While the time sheets were less than a model of clarity, it does appear that Ameri-Trust's attorneys provided valuable assistance in addressing tax issues in the disclosure statement, writing explanatory letters to its constituents regarding the plan, researching tax issues regarding the liquidating trust, and pursuing a revenue ruling regarding the liquidating trust. According to our calculations, some 111 hours were expended by Squire, Sanders on these services, which we view as having directly benefitted all of the creditors of the estate. For this substantial contribution we hereby award $20,000 in fees and expenses.

The application of in-house counsel, Mr. Thomas Butler, makes it apparent that he served as an active, involved committee member. However, his timesheets fail to meet the minimum requirements set early on in these cases. While we agree with former managements's view that his role in these cases was a positive one, no evidence has been tendered which would support a finding that his services should be reimbursed under the standard of § 503(b)(4).

Mr. Aveni's involvement in this case consisted of acting as a second committee representative for AmeriTrust, and in providing advice to the committee regarding the estates' Indiana insurance subsidiaries in his capacity as an in-house insurance expert for AmeriTrust. He estimates that he spent 700 hours on this case, but no timesheets are available to substantiate this estimate. We conclude that this lack of documentation is fatal to the bank's claim for partial reimbursement for his services. The time he spent merely as a second representative clearly would not be reimburseable. Even though counsel for the DHB committee represented that the committee requested that he investigate the Indiana subsidiaries, we have no way of accurately determining how much of his time was spent on this project. The claim for reimbursement for his travel expenses as a second representative to the committee must also be denied, since this Court flatly ruled in the early stages of this case that reimbursement for such expenses would be limited to *one* representative for each committee member.

### 4. *California First Bank.*

California First Bank ("Cal First") was a short-term lender of BU, and served on the BU creditors' committee. It was represented by the Los Angeles law firm of Gendel, Raskoff, Shapiro & Quittner ("Gendel") until that firm became successor counsel for the committee as a whole. Leucadia has objected to this application in its entirety.

The primary basis for the bank's application for reimbursement of $114,093.80 in fees and expenses paid to Gendel is aptly summarized in former management's recommendation:

Cal First and its counsel, Gendel, played an important role in this case prior to the sale of the Colorado banks (and the concurrent departure of the Baldwin–United Senior Debenture holders). During that time, the Baldwin–United Creditors Committee, led mainly by certain Baldwin–United Senior Debenture holders, embarked on what Baldwin believed to be a "scorched earth" policy by opposing every action sought to be taken by Debtors and initiating other actions to hinder and

delay the bankruptcy proceedings. Cal First was one of the few members of the Baldwin–United Creditors' Committee who attempted to dissuade its members from taking some of the actions the committee was considering. We believe that Cal First and its counsel made a substantial contribution to this case and should receive some compensation. We therefore recommend that Cal First be reimbursed for $50,000 of its expenses under section 503(b).

■ We are much inclined to agree with this recommendation, as supplemented by testimony of both Palmieri and Martosella as well as O'Melveny attorney Robert White (Tr. of April 7, 1987, at 76–77; 132; 167). Indeed, this Court's own observation during the grim and chaotic days of late 1983 through late 1984 coincide with the assessment. Counsel for Cal First often stood as the only voice of reason amid the appearance of a continuous, movable brawl among the members of the BU committee and its counsel. Many of the suggestions and comments made by Cal First in open court served to quell (at least temporarily) the wrath of the committee against the Debtors. Unfortunately, Gendel's time sheets provide slight evidence of Cal First's efforts not only to mediate disputes and redirect the committee's vision of these cases, but also to provide a much-needed communication link between the Debtors and the committee.

As was true in *In re Paolino,* 71 B.R. 576, 581 n. 5 (Bankr.E.D.Pa.1987), it would be inequitable *in this particular instance* to deny the application completely, particularly where the testimony, albeit not the timesheets, strongly supports it. Based upon the evidence, as well as this Court's knowledge of this case, we conclude that an award of $25,000 in fees and expenses is certainly appropriate.

*5. Porter, Wright, Morris & Arthur.*

■ Porter, Wright, Morris & Arthur represented three entities which held a total of nearly $25 million in BU senior debentures issued in connection with DHB's Colorado bank limited partnership. Two of these three entities, The Algonquin Trust and The Camargo Trust, were members of the BU creditors' committee. Porter, Wright seeks fees and expenses totaling $112,153.75. Leucadia has objected to the firm's application in its entirety, while the joint creditors' committee has objected in part. Former management has recommended that the application be denied.

Based upon our review of the copious materials presented by Porter, Wright we agree, at least for the most part, with the position of the objectors and former management. Porter, Wright claims to have made a substantial contribution to these cases primarily in three areas.

Initially, it claims that it was the first to suggest that these estates could and should be substantively consolidated. Regardless of whether it was the first to raise it, this issue was blindingly apparent to almost everyone (including this Court) from the day these cases were filed, and probably long prior to that date. Indeed, the issue was raised at the very first status conference in these cases, and virtually every one thereafter. (*See, e.g.,* Tr. of Oct. 17, 1983, at 51.) The issue was hardly a secret to O'Melveny & Myers, either, since that firm spent hundreds of hours analyzing the question and preparing a lengthy memorandum in support of substantive consolidation. Because the time Porter, Wright spent on this issue was primarily for the benefit of its clients, and because it duplicated the efforts of both Debtors' counsel and those of many other parties, no finding of a substantial contribution is warranted.

Porter, Wright also claims to have been the first to pursue fraudulent transfer and preference claims against the insurance rehabilitators. According to the timesheets and Mr. Irving Harris' affidavit, it was Porter, Wright's threat to file a complaint asserting these claims which directly resulted in the January 30, 1984 standstill agreement between the Debtors and rehabilitators.

We cannot agree. Whatever may have been the impression of members of the BU committee at the time, the fact is that the Debtors' threat to file a complaint in this

Court on January 30, 1984 was what directly resulted in a standstill agreement that same morning. A sealed transcript of that in-chambers meeting memorializes the event. Even if the facts were otherwise, it is quite unlikely that Porter, Wright's complaint would have had the dramatic effect on the rehabilitators which has been claimed, since a creditor would have had no standing to bring claims against them absent a refusal by the Debtors to do so. Such was certainly not the case here, since O'Melveny's time sheets indicate extensive research on these matters virtually from the commencement of the case. Since these efforts, too, were wholly duplicative and within the exclusive province of the Debtors, no compensation can be awarded under § 503(b)(3)(D).

The third basis for Porter, Wright's claim stands on a different footing. Mr. Harris asserts that he and his firm developed a plan to purchase the Colorado banks which eventually drew a competing bid from AmeriTrust. Harris obtained a $100 million loan commitment from Bank One of Ohio toward this end, pursued his purchase plan with Debtors' management, and sold it to the creditors' committees. In April of 1984 AmeriTrust, a major competitor of Bank One, unveiled a $105 million competing proposal which eventually was accepted by the Debtors.

Porter, Wright's activities in this regard are well-documented in both its timesheets and Harris' affidavit as well as by Victor Palmieri's testimony:

> ... [T]here's no question that Mr. Harris was a moving force in seeking to resolve the tangle and it was a tangle surrounding the Colorado Banks by seeking to get a fully financed transaction and offer on the table. That was, in my judgment, stimulative of the entire outcome ...
>
> (Tr. of April 7, 1987 at 167.)

Based upon a preponderance of the evidence, we conclude that Porter, Wright's services in this matter constituted a substantial contribution to these cases. By our calculation, it is entitled to and is hereby awarded $18,728 in fees and $3,000 in expenses. Because the remainder of the

firm's services, including those involving the hearing on the sale of the Colorado banks, were either primarily for the benefit of its clients or duplicated the efforts of the Debtors' counsel, the remainder of its application will be denied.

### III. Additional Fees Sought Under Section 330.

Certain counsel for the Debtors, counsel for the committees, and the financial advisor for the committees seeks fees in addition to those already awarded on an interim basis under 11 U.S.C. § 331. Former management has recommended that these additional fees (variously termed by the parties as bonuses, enhancements, or lodestar corrections) be awarded in somewhat reduced amounts to the attorney applicants. Leucadia has objected to all of these applications as a matter of fact and law, strenuously arguing that the U.S. Supreme Court's decisions in *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. ——, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) (Delaware Valley I) and *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. ——, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) (Delaware Valley II) prohibit such awards.

We are thus forced to return to a subject which we first addressed in *In re Schaeffer*, 71 B.R. 559 (Bankr.S.D.Ohio 1987). There, this Court applied the Supreme Court's holdings in *Blum* and *Delaware Valley I*, and concluded that in the absence of specific evidence establishing that the case was rare or exceptional, or involved an inordinate risk of loss, upward adjustments in the lodestar calculation could not be awarded. *Id.* at 563.

*Schaeffer* was decided without the benefit of the Supreme Court's ruling in *Delaware Valley II*, which specifically addressed the issue of whether the lodestar could ever be enhanced based on the contingent nature of a case. In a four-man plurality opinion reminiscent of *Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), the Supreme Court

reversed the judgment awarding the enhancement.

Significantly, the plurality opinion first addresses certain factors which play no part in the question of fee enhancement for the risk of nonpayment. The most significant of these is the delay factor, which the plurality finds to be a distinct issue and which may be compensated for "either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value." 483 U.S. at ——, 107 S.Ct. at 3081, 97 L.Ed.2d at 592. The plurality then turns to an analysis of whether fee enhancement for the risk of nonpayment may be necessary to effectuate the intent of Congress in enacting fee-shifting statutes, i.e., "... to make it possible for those who cannot pay a lawyer for his time and effort to obtain competent counsel, this by providing lawyers with reasonable fees to be paid by the losing defendants." At ——, 107 S.Ct. at 3086, 97 L.Ed.2d at 598. The plurality concluded, however, that "multipliers or other enhancement of a reasonable lodestar fee to compensate for assuming the risk of loss is impermissible *under the usual fee-shifting statutes*," *id.* at ——, 107 S.Ct. at 3087, 97 L.Ed.2d at 599, (emphasis added).

The plurality concludes that even if § 304(d) of the Clean Air Act, 42 U.S.C. § 7604(d) "and other fee shifting statutes" were construed to allow fee enhancement for risk of nonpayment, such an award could not be justified in the instant case. Id. at ——, 107 S.Ct. at 3087, 97 L.Ed.2d at 599. Noting that such statutes leave the question of enhancement to the informed discretion of the courts, the Court first repeated the admonition in *Blum* that "enhancement for the risk of non-payment should be reserved for exceptional cases where the need and justification for such enhancement are readily apparent and are supported by evidence in the record and specific findings by the courts." At ——, 107 S.Ct. at 3088, 97 L.Ed.2d at 599. In *Delaware Valley*, the plaintiff's fee enhancement was based on efforts to enforce a consent decree. While these efforts may have been time-consuming and taxing, they involved no novel or unsettled questions of law, and no real risk of not prevailing. Indeed such risks can be realistically assessed at the beginning of the case, rather than at the end. The Court further found that doubling the lodestar was excessive and opined that even where the burden of proof for establishing the right to enhancement was met, an enhancement of more than one-third over the lodestar could almost never be justified. Finally, the Court held that regardless of the risks, enhancement would not be warranted absent a finding that "plaintiff would have faced substantial difficulties in finding counsel in the local or other relevant market" absent the prospect of such enhancement. *Id.* at ——, 107 S.Ct. at 3089, 97 L.Ed.2d at 601.

In a separate opinion Justice O'Connor joined the dissent in concluding that "Congress did not intend to foreclose consideration of contingency in setting a reasonable fee under fee-shifting provisions such as that of the Clean Air Act ..." and that the contingency factor must be judged according to the class of cases involved, not any particular case. *Id.* at ——, 107 S.Ct. at 3089, 97 L.Ed.2d at 601. However, Justice O'Connor agreed with the plurality that a showing of substantial difficulty in finding counsel to take the case was a prerequisite to awarding an enhancement. While she also concurred in the view that novelty and complexity were subsumed with the lodestar amount, she further observed that

... [I]t is presumed that when counsel demonstrates considerable ability in overcoming unusual difficulties that have arisen in a case, counsel will be compensated for those accomplishments by means of an appropriate hourly rate multiplied by the hours expended.

*Id.* at ——, 107 S.Ct. at 3091, 97 L.Ed.2d at 603.

While the considerations and mandates found in *Delaware Valley II* may fit within the contours of the usual fee-shifting statute, much of what is said in the plurality and concurring opinions bears little relevance to § 330(a)(1) or to most bankruptcy cases, particularly large corporate reorganizations.

If § 330 can be termed a "fee-shifting" statute, it is certainly not the "usual" sort contemplated by *Delaware Valley II.* The legislative history of that section indicates that Congress was primarily concerned with protecting the public interest in the smooth, efficient operation of the bankruptcy system by encouraging competent bankruptcy specialists to remain in the field. Toward this end, Congress specifically disavowed notions of conservation of the estate and economy of administration, and provided that bankruptcy compensation should be comparable to what is charged in nonbankruptcy matters. 124 Cong.Rec. H 11,091–2 (Sept. 28, 1978); S 17,408 (Oct. 6, 1978).

This clear expression of the intent of Congress in enacting § 330(a)(1) is in stark contrast to that of the usual fee-shifting statutes, which were not "intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client." *Delaware Valley I,* 478 U.S. at ——, 106 S.Ct. at 3098, 92 L.Ed.2d at 456.

References to "prevailing party" and "contingent fee arrangements" in *Delaware Valley II* reinforce the conclusion that the Supreme Court's pronouncements have little applicability to bankruptcy proceedings. While bankruptcy courts sometimes approve contingent fee arrangements for special counsel representing the Debtor, such arrangements are rarely, if ever, approved for Debtor's counsel in the bankruptcy case itself. The concept of a prevailing party in bankruptcy cases is equally incongruous. While a debtor or creditor may prevail in one or more of the many disputes which arise in the course of a typical Chapter 11 reorganization, almost everyone loses something.

■ Ultimately, the attempt to apply fee-setting standards in a litigation context to fee-setting standards in the bankruptcy field must reach a breaking point. We conclude that *Delaware Valley II* reaches that point, and is simply inapplicable to bankruptcy cases.

However, we further conclude that the "rare and exceptional" standard of *Blum v. Stenson, supra,* as amplified in *Delaware Valley I,* strikes the balance mandated by Congress to fully compensate bankruptcy counsel with a reasonable but not excessive fee. *See, In re Powerine Oil Co.,* 71 B.R. 767 (9th Cir. BAP 1986); *In re White Motor Credit Corp.,* 50 B.R. 885, 890 (Bankr.N.D.Ohio 1985).

As indicated in our findings below, the applications (with one exception) should be granted, at least in part, regardless of which standard is applied.

1. *O'Melveny & Myers*

O'Melveny & Myers seeks an enhancement of $1,903,449.33 or 16.8% of the $11,341,550.67 it has thus far been awarded in these cases. Management has recommended that the application be granted to the extent of $1.8 million. AmeriTrust has objected to the application in part, while Leucadia urges that it be denied in its entirety.

■ Pursuant to this Court's order in the early stages of these cases, a 30% holdback was imposed upon all fees awarded to counsel for the Debtors and committees. The amounts held back were released by the Court in November of 1986. Pursuant to *Delaware Valley II,* we find it appropriate to compensate O'Melveny and the other attorney applicants before us for the loss of use of money incurred by this holdback. We find the appropriate blended rate of interest for the period between late 1983 and late 1986 to be 9%. According to an exhibit provided to the Court by AmeriTrust, at a rate of 9%, the appropriate award for O'Melveny's loss of use over the duration of the case would be $455,269.43. Accordingly, we hereby award O'Melveny that amount to compensate for the delay factor. *See, e.g., In re WHET, Inc.,* 62 B.R. 770, 776–777 Bankr.D.Mass.1986).

We have little difficulty in finding that O'Melveny is entitled to a fee enhancement in addition to this amount. While the introductory portion of this opinion does not adequately convey the continuing state of crisis which relentlessly attended these cases, we believe it does provide the bare outline of what made these cases unique in the history of bankruptcy law. Indeed, we

dare say that there has never been and (hopefully) never will be others quite like them. Although O'Melveny is one of the largest law firms in this country, the evidence strewn throughout the records of these proceedings conclusively establishes that even this firm staggered under the weight of Baldwin's problems. Only a handful of firms could have attempted to muster the resources and expertise which these cases constantly demanded. Few, if any, could have handled these cases in so outstanding a fashion as this one.

 Without repeating each of the numerous achievements cited in the discussion above, suffice to say that O'Melveny was largely responsible for taking a system composed of over 200 debt-ridden entities holding virtually no assets outright, and transforming it into one solvent company. In less than three years, the firm settled or litigated over 132 proceedings (many of which were mind-boggling in their complexity) involving some $33 billion in claims, resulting in a total of some $423 million in allowable claims against the estate. In large measure, it was responsible for creditors recovering what will approach 60 cents on the dollar, some six-fold more than projections at the beginning of these cases. Given the nature of the claims of the insurance rehabilitators and others, it was entirely conceivable, and at times probable, that the unsecured creditors of the estate and the equity security holders might receive nothing, and that the professionals in these cases might receive next to nothing. As Victor Palmieri testified, "[T]he real question at all times was, would there be anything left?" (Tr. of April 7, 1987 at 154.) Because the rehabilitators' settlement was contingent in part upon a settlement with the Balunit banks, and both were contingent upon a tax settlement, this question was not finally answered in the affirmative until at least April of 1986.

Because we find that the risk of nonpayment was great, the circumstances were rare and exceptional, and the results were outstanding by any standard, we conclude that the lodestar amount should be enhanced in the sum of $1.3 million. Alternatively, the undisputed evidence establishes that O'Melveny has demonstrated "considerable ability in overcoming unusual difficulties that have arisen" in these cases (483 U.S. at ——, 107 S.Ct. at 3901, 97 L.Ed.2d at 603), and that the hourly rate used to compute the lodestar in these cases was not comparable to the blended hourly rate O'Melveny would receive in ordinary, nonbankruptcy matters. (Tr. of April 8, 1987 at 9–19.) The amount of this shortfall approximates the $1.3 million award. Accordingly, the total amount awarded to O'Melveny & Myers pursuant to its application is $1,755,269.43.

### 2. *Debevoise & Plimpton*

Debevoise & Plimpton has applied for an enhancement of $552,218.64 or 14.8% of the $3,786,195.16 it has thus far been awarded in these cases. Management has recommended that the application be granted to the extent of $552,219. AmeriTrust has objected to the application in part, while Leucadia objects to it in its entirety.

As compensation for the loss of the use of $1,099,123.91 held back over the course of this case, the firm should be and is hereby awarded $230,468.65.

 The primary basis for Debevoise's enhancement request centers on its representation of the Debtors in the SEC's investigation. By our calculation, the fees generated by this representation totalled $1,466,558.40. Mr. Wallace Timidy, an attorney for the law firm of McGuire, Woods, Spattle & Booth of Richmond, Virginia and a former deputy director of the SEC's Division of Enforcement, testified on behalf of Debevoise's application. According to his undisputed expert testimony, the scope of the SEC's investigation into Baldwin's affairs was the broadest he had ever seen. (Tr. of April 8, 1987 at 163.) The SEC's first subpoena sought hundreds of thousands of documents, and also sought to "interview" 18 present and former members of Baldwin's management. Additional subpoenas seeking more documents and additional witnesses were almost certain to follow.

As a result of Debevoise's unprecedented action to enjoin this investigation, the SEC reduced its list of interviewees from 18 to 9, and otherwise agreed to limit discovery, a result which Timidy termed "exceptional" and which to his knowledge had never occurred before. (Tr. of April 8, 1987 at 165.)

In addition to limiting the scope of the investigation, Debevoise managed to eliminate certain remedial provisions which the SEC initially sought to include in a permanent injunction. All of these remedies would have significantly impaired the reorganized company's ability to operate. The most detrimental of these provisions would have required the company to maintain an independent outside audit committee, which would have served as a shadow board of directors. Timidy termed the elimination of these provisions extraordinary, noting that "it [was] probably the difference between coming out of the [reorganization] and not coming out of the [reorganization]." (Tr. of April 8, 1987 at 175.)

Given the enormous additional expense to the estates which the SEC's investigation, as originally configured, would have cost, as well as the great skill which was brought to bear in limiting the remedial provisions of the final decree, we find by a preponderance of the evidence that rare and exceptional circumstances, a substantial risk of non-payment, and an outstanding result, justify a fee enhancement in the amount of $300,000.

In the alternative, the undisputed evidence presented by Debevoise indicates that its blended hourly rate on the SEC investigation amounted to only $80 to $104 per hour, and that its normal hourly rate for nonbankruptcy matters during the same period amounted to $142 to $151 per hour. The difference in rates resulted in a lodestar which was some $991,000 less than it normally would have been. (Tr. of April 8, 1987 at 136–137.) Thus, a $300,000 correction in the lodestar is certainly justifiable. Accordingly, Debevoise & Plimpton is awarded $530,468.65 pursuant to its application.

### 3. *Cadwalader, Wickersham & Taft*

Cadwalader, Wickersham & Taft seeks an enhancement of $36,500 or 10% of the $364,861.82 already awarded. Former management recommends that the fee be allowed in full. AmeriTrust objects to the application in part, while Leucadia objects to it in its entirety.

 Mr. Donald Alexander, a former Commissioner of the Internal Revenue Service, represented the Debtors as special tax counsel. He played a key role in bringing about the $50 million settlement of the IRS's $450 million in claims.

In addition to the $6,445.68 to which his firm is entitled as a result of the holdback delay, we conclude that Cadwalader is entitled to an additional $30,000 in fee enhancement. The issues involved in the IRS' claims numbered in the thousands, and many of them were of first impression. While this may not have been the largest sum ever sought by the IRS in a bankruptcy proceeding, it is certainly one of the largest. Mr. Alexander's participation in obtaining the outstanding result for the Debtors was adequately documented in his timesheets and his submissions to this Court, and can certainly be characterized as exceptional. For these reasons, as well as the significant risk of non-payment which he, too, confronted, Cadwalader is hereby awarded a total of $36,445.68

### 4. *Gendel, Raskoff, Shapiro & Quittner*

Gendel, Raskoff, Shapiro & Quittner seeks an enhancement of $215,000 or 17.1% over the $1,260,572.05 already awarded. AmeriTrust has objected to this application in part, while Leucadia has objected to it in its entirety.

In order to compensate Gendel for the delay in receiving the fees held back during the course of its representation, the firm is hereby awarded $36,482.91.

 Gendel was appointed successor counsel to the BU creditors' committee in November of 1984. It was the opinion of this Court then, and it remains the Court's opinion that this firm's entry into these

cases as committee counsel was one of the more significant events in the course of these proceedings. Almost immediately upon Gendel's arrival as counsel, the tenor of the committee went from combative to cooperative. While this was undoubtedly due in part to the departure of the Colorado bank debenture holders following the AmeriTrust sale, we attribute this change in direction largely to the wisdom and experience of the attorneys advising the committee. A new spirit of cooperation was extended not only to the Debtors, but also to the DHB committee which had previously found the committee difficult to work with. Gendel and its DHB counterparts moved quickly to divvy up responsibilities so as to avoid duplication of effort, consulted with counsel for the Debtors to avoid needless court contests, and raised objections only when necessary to protect its committee's interest.

The turnaround in the BU committee's approach which Gendel engineered is best illustrated by the Bigelow–Sanford matter. When the Debtors proposed, in essence, to sell Bigelow–Sanford back to that company's management, and requested authority for BU to release its third right of first refusal for the purchase of Bigelow's stock, the BU committee objected. It appealed from this Court's order overruling those objections, and *then* sought authority to hire an investment banking firm to investigate the transaction, asserting that BU's third right of first refusal might be worth millions of dollars. This Court denied the request. Notwithstanding the District Court's dismissal of its appeal from the bench, and notwithstanding § 363(m), the committee continued to pursue the matter in the U.S. Court of Appeals for the Sixth Circuit. Shortly after Gendel became counsel, the appeal was dismissed, thus putting an end to a relatively insignificant dispute which had generated tens of thousands of dollars in fees and numerous hours of court time.

Had the sound judgment and steady hand of Gendel not been infused into this case, it is unlikely that a consensual plan of reorganization could have been arrived at so quickly, or perhaps ever.

While the lodestar figure may take into account such superior skill and judgment, it does not take into account the substantial risks which all committee counsel undertook to arrive at a confirmed plan in these cases. Those risks went beyond mere nonpayment. Many of the settlements and strategies which the Debtors were forced to pursue required committee counsel to quickly assess and make decisions on exceedingly complex matters, sometimes with only a minimum of time for review and analysis by the committee. The easier path would have been to object to the Debtors' proposals, buying time and avoiding the risk and possible consequences of being wrong. Gendel, as well as other counsel for the committees, put itself on the line with its constituents and backed the Debtors in most of their efforts, ever keeping in mind its clients' interests. By doing so, it was able to achieve an outstanding result for all involved.

As was true of O'Melveny, we find that the circumstances as well as the quality of Gendel's representation in these cases were inherently rare and exceptional. Accordingly, we hereby award Gendel a fee enhancement of $150,000, for a total award of $186,482.91.

In the alternative, we note that Gendel has presented undisputed evidence that its blended hourly rate in nonbankruptcy matters was $180–$185 per hour during the applicable period, while $157.50 was the blended rate in these cases. The fee awarded above adequately corrects the lodestar amount required by § 330(a)(1) and is justified by the unusual skill which counsel brought to these cases.

### 5. *Blank, Rome, Comisky & McCauley*

Blank, Rome, Comisky & McCauley has applied for a fee enhancement of $240,000 or 18.1% of the $1,323,448.70 it has already received. Former management has recommended an enhancement of $200,000. AmeriTrust has objected in part to this application, while Leucadia has objected to it in its entirety.

Blank, Rome has served as successor counsel to the DHB creditors' committee from March of 1984 to the present. To compensate for the delay resulting from the 30% holdback, this firm is hereby awarded $52,347.50

As for its enhancement application, what has been said about Gendel, Raskoff applies with equal force to this firm. It led the way in attempting to avoid litigation and arrive at a consensus on the dizzying array of problems which confronted these estates. Its meticulous but efficient analysis of these problems was of great assistance, not merely to the Debtors, but to this Court. As was true of Gendel, its performance in these cases was marked by a willingness to make decisions and take risks in order to enhance the Debtors ability to reorganize. It played a significant role in the drafting of the plan and the liquidating trust, and was instrumental in building the consensus which led to the confirmation and effectuation of these provisions.

For the reasons stated in approving the award to Gendel, we hereby award Blank, Rome $150,000 as a fee enhancement, for a total award of $202,347.50. In the alternative, the undisputed evidence indicates that Blank, Rome's normal blended hourly rate for nonbankruptcy matters during the applicable period was in the range of $135, while its blended rate in these cases was only $115.66. Pursuant to the standards set forth in § 330(a)(1), an adjustment to the lodestar is appropriate, and our award adequately accomplishes this result.

### 6. Booth, Marcus & Pierce

Booth, Marcus & Pierce seeks an enhancement of $135,000 or 18.5% of the $762,785.02 which it has thus far received. Former management has recommended that the firm be awarded $115,000. AmeriTrust has objected to the application in part, while Leucadia objects to it in its entirety.

To compensate for the delay in receiving 30% of its fees, the firm is hereby awarded $29,829.49.

Booth, Marcus represented the common stockholders' committee in these cases. The enormous negative net worth of the Debtors put equity security holders in serious jeopardy of receiving nothing under the plan. While this committee could have adopted an obstructionist or renegade role in these cases, it chose instead to participate in this reorganization in a temperate and positive fashion. We credit Booth, Marcus with leading this committee toward an outstanding result not only for its clients, but also for the various groups of preferred shareholders who held a higher priority of distribution.

As was true of Gendel and Blank Rome, the hallmark of Booth, Marcus' representation was the exercise of superior judgment and the willingness to take risks in order to obtain a consensual plan. As attorney Peter Wolfson noted, the precarious position of the common stockholders required their counsel to walk a tight rope between the spectre of a cram down and the hope of a realistic recovery. This Court did not always agree with the positions this firm took, particularly as to its opposition to the Colorado bank sale. Unlike other objectors, however, its opposition to that sale primarily centered on its concern for whether certain debenture holders who had engaged in other transactions with the Debtors might be receiving a windfall, a concern which this Court frankly shared. Its opposition provided a vehicle for examining this issue.

After this Court's decision regarding the bank sale was affirmed by the District Court, an uninvolved member of the firm made an independent assessment of the committee's position, and the decision was made not to pursue an appeal.

By extending its representation to other equity holders, and by its suggestion of issuing warrants as an additional item of compensation, Booth, Marcus was instrumental in obtaining approval for the plan of reorganization. It obtained an exceptional result for all equity holders under exceptionally bad circumstances. Accordingly, we hereby award this firm an enhancement of $85,000, for a total award of $114,829.49.

### 7. *Shearson Lehman Brothers, Inc.*

Shearson Lehman Brothers, Inc. seeks an enhancement of $1.5 million, or 272.7% of the $550,000 it has already received. Former management has recommended that it be awarded nothing, the only recommendation in which all parties responding to these applications have joined.

 Shearson was retained by both creditors' committees to serve as their financial advisor in the negotiation of a plan of reorganization. By way of Shearson's engagement letter, it was to conduct a financial review and evaluation of the Debtors and their proposed plan; advise the committees as to the reasonableness and feasibility of such plans; advise with respect to possible improvements in the plan and any securities which might be issued pursuant thereto; assist in the negotiation of a consensual plan and the development of alternative plans; and provide advice as to potential market values of any securities to be issued. In exchange for these services, it was to be paid $75,000 per month. It was also to be indemnified by the estates for all losses, claims, damages, or liabilities arising out of or in connection with its services in these cases, including attorneys fees, except for liabilities arising out of its gross negligence or bad faith.

Shearson was initially retained for a three-month period beginning February 14, 1985. Its retention was extended through September 15, 1985, and again until December 15, 1985. It continued to render services thereafter until the beginning of 1986. From September until December, 1985 it was paid $100,000 per month.

While there is no question that Shearson performed capably throughout its retention, its application must be denied in its entirety for a number of reasons. First, under paragraph J of this Court's January 5, 1984 Order Establishing Interim Fee and Expense Reimbursement Procedures, any professional who was paid 100% of the fees approved by this Court was deemed to have received "full satisfaction ... of ... all ... reasonable compensation under 11 U.S.C. § 330 (Case No. 1–83–02495, Doc. 290).

Since Shearson falls into this category, its request must be denied on this basis alone.

Second, Shearson has submitted no timesheets to justify the enormous enhancement it seeks. The firm does not keep time records, but rather bills on the basis of the results achieved. While its private clients may be satisfied with this arrangement, it fails to comply with this Court's fee guidelines and applicable case-law.

Finally, we can find nothing in the record which would support any enhancement of its fee. The firm's application is premised almost exclusively on its work in developing and proposing to the Debtors the issuance of zero coupon bonds, a concept which it claims was never before used in a Chapter 11 reorganization case. Be that as it may, the evidence establishes that zero coupon bonds are hardly a unique concept. Indeed, Debtors' investment advisor, Goldman, Sachs had already investigated the use of such bonds prior to Shearson's proposal. While Shearson claims that it almost single-handedly brought about a consensual plan by selling this idea to the Debtors, we find this claim to be, at best, grossly inflated.

Shearson initially claimed to have been the originator of the idea of issuing warrants to the shareholders, but later conceded that the idea may have come from counsel for the common stockholders' committee.

While this Court has previously stated on the record that the world of investment banking must be a strange and wonderful place, we are unable to conceive of a world where four people working part time over a period of ten months can be paid $550,000, and then be paid a bonus of $1.5 million for their efforts. Shearson did what it said it would do, got paid handsomely for it, and incurred little, if any, risk in the process. It is entitled to nothing more. Such is the world of bankruptcy.

## IV. CONCLUSION

While the following observations are not entirely relevant to the merits of the applications reviewed above, they may serve to put Leucadia's objections into clearer fo-

cus. After two and a half years of fighting constant battles and jumping seemingly insurmountable hurdles, the professionals in these cases saw a plan of reorganization confirmed. From their efforts, a new company emerged out of the rubble of Baldwin. It was no secret to anyone, least of all Leucadia, that the plan called for some $25 million to be set aside for administrative expenses, and that $3.5 million was earmarked for the applications which have here been considered. Leucadia bought into the achievements wrought by the labors of the professionals in these cases, and by all accounts has profited generously in its venture. While we respect its right to object to these applications, and indeed appreciate its assistance in evaluating them, its position in these cases hardly rises to the level of a downtrodden creditor seeking to assure a fair distribution of the estate's assets. We find it odd that it would embrace the benefits of the confirmed plan while seeking to reject its less profitable provisions.

Judgments shall enter in accordance with the above findings.

IT IS SO ORDERED.

## EXHIBIT A

## MAJOR AFFILIATE SECURITIES TRANSACTIONS

*Claims Arising From The Acquisition Of The MGIC Investment Corporation*

90. In March 1982, B–U and DHB acquired, through its subsidiary Balunit, the MGIC Investment Corporation ("MGIC") for the aggregate amount of $1,170,000,000 in cash. Of this amount, at least $517,000,-000 was derived from internally generated sources. The remainder of the purchase price was supplied by a one-year, $584,000,-000 term loan to Balunit from a group of banks (the "Balunit Banks"), which was secured by a pledge of all of the common stock of MGIC, and by a loan of $70,000,-000 from Chase Manhattan Bank (the "Chase Loan"). The $517,000,000 in cash from internal sources, with exception of $17,000,000, was removed by B–U and DHB from the Insurance Companies and their service affiliate, the National Investors Service Company ("NISCO", which hereafter shall be included in the term "Insurance Companies"), for little or no consideration. See Exhibits B(1)–B(6).

91. After consummation of the MGIC acquisition, the Debtors removed an additional $235,000,000 in cash from the Insurance Companies for little or no consideration in a futile effort to meet debt payment obligations incurred in connection with the MGIC acquisition. See Exhibits B(1)–B(6).

92. As a result of the Debtors' actions an aggregate amount of approximately $735,000,000 in cash, which constituted funds derived from premiums paid by policyholders and held by the Insurance Companies in trust for the policyholders, was removed and replaced with assets of little or no value, including a substantial amount of Balunit stock. The Balunit Common and Preferred Stock sold to the Insurance Companies in exchange for cash was sold at a price which far exceeded the value of the Balunit stock at the time of the sales. Furthermore, Debtors knew at the time of the sales that the Balunit stock would undergo further material devaluation as a direct result of Debtors' actions in administering the assets of Balunit. Reasonable business judgment indicated that repayment of the bulk of Balunit's bank debt in the normal course would be impossible, thereby prohibiting payment of dividends on the Balunit Preferred or Common Stock and eventually requiring a forced sale of MGIC. By this process, the value of Balunit equity would be and was inevitably reduced substantially below the prices paid by the Insurance Companies. Debtors' futile attempts to avoid this result constituted the siphoning of cash out of the Insurance Companies in exchange for worthless affiliate securities and illusory reinsurance obligations. Such affiliate securities were to include additional Balunit Preferred Stock in an aggregate par value of at least $150,000,000. See Exhibits B(1) and (7)–(13).

93. The transfer of cash out of the Insurance Companies to consummate the MGIC acquisition and meet refinancing ob-

ligations thereafter was accomplished in the following transactions.

94. An aggregate number of 1,201 shares of Balunit Common Stock were issued directly to the Insurance Companies in March 1982 for an aggregate amount of $240,200,000 in cash as indicated below:

| Insurance Company | Cash Price Paid | No. of Shares |
|---|---|---|
| NIPIC | $ 98,300,000 | 491.5 |
| NILIC | 5,200,000 | 26.0 |
| Mt. Hood | 7,700,000 | 38.5 |
| Baldwin Enterprises | 12,000,000 | 60.0 |
| NFU PACCO | 7,200,000 | 36.0 |
| NFU Life | 4,500,000 | 22.5 |
| NEL | 200,000 | 1.0 |
| IEL | 400,000 | 2.0 |
| Mid-West | 300,000 | 1.5 |
| College/University | 4,400,000 | 22.0 |
| NISCO | 100,000,000 | 500.0 |

95. An aggregate number of 1,507.5 shares of Balunit Common Stock were issued to the Debtors upon payment of approximately $267,010,000 in cash, which constituted funds removed from the Insurance Companies for little or no consideration as specified below:

| Insurance Company | Amount of Cash Taken |
|---|---|
| NISCO | $ 17,110,000 |
| NIPIC | 230,400,000 |
| College/University | 2,600,000 |
| NFU PACCO | 14,500,000 |
| NFU Life | 2,400,000 |

96. In January 1982, B–U removed $17,110,000 in cash from NISCO to purchase 352,800 shares of MGIC Common Stock on the open market. In June 1982, B–U received 85 shares of Balunit Common Stock from Balunit in exchange for the MGIC shares. B–U then gave NISCO the 85 Balunit shares, which were of little or no value at that time.

97. In February 1982, B–U removed $50,000,000 from NIPIC in exchange for the rights to receive proceeds from sale of servicing contracts of mortgage banking companies, assets of little or no value. B–U purchased 250 shares of Balunit Common Stock from Balunit for the $50,000,000.

98. In March 1982, DHB received 865 shares of Balunit Common Stock from Balunit through a series of transactions paid for with $138,400,000, which amount was removed from NIPIC for little or no consideration. DHB transferred to Balunit all of the outstanding stock of various of its insurance subsidiaries and other subsidiaries, including National Farmers Union Services Corporation, National Farmers Union Standard Insurance Company, IEL, NEL and National Business Services, Inc. Balunit then transferred the stock received to MGIC and its subsidiaries in exchange for other assets, including cash. Balunit removed $138,400,000 in cash from NIPIC in exchange for certain of the assets Balunit received from MGIC, including real estate for which $73,585,000 was paid and mortgage loans for which $64,859,194 was paid. Such assets were at the time of the exchange and are now worth substantially less than $138,400,000 and are inappropriate investments for an insurance company.

99. In February 1982, a subsidiary of NIPIC, The Sperry & Hutchinson Company, Inc. ("S & H Inc."), a subsidiary of NIPIC, transferred various real estate assets, including a leasehold interest at 330 Madison Avenue, New York, New York, and warehouses, to subsidiaries of the Debtors in exchange for the aggregate amount of $42,000,000 in cash. All of the cash received was removed by the Debtors from S & H Inc. for no consideration. DHB gave Balunit the $40,000,000 it received in exchange for 190 shares of Balunit Common Stock and B–U gave the $2,000,000 it received in exchange for 10 shares of Balunit Common Stock.

100. In March 1982, B–U received an illegal dividend of $2,600,000 from College/University Holding Corporation ("College/University Holding"), a parent of UL, which B–U then gave to Balunit in exchange for 13 shares of Balunit Common Stock. The dividend monies were taken by College/University Holding from College/University for no consideration.

101. In March 1982, DHB removed (a) $14,500,000 in cash from NFU PACCO in exchange for a portion of the stock of S & H, an asset of little or no value at that time, and (b) $2,400,000 in cash from NFU Life for a portion of the stock of S & H. DHB then gave the total amount of cash received, $16,900,000, to Balunit in ex-

change for 84.5 shares of Balunit Common Stock.

102. From July 1982 through the end of 1982, Debtors continued to remove cash in an aggregate amount of at least $227,500,000 from the Insurance Companies in exchange for consideration of no or little value through a series of transactions described below. The cash was used to repay Balunit debt and refinance obligations of the Debtors incurred in connection with the MGIC acquisition.

103. In order to obtain regulators' approvals for the purchase by NISCO of 500 shares of Balunit Common Stock in March 1982, the Debtors agreed to repurchase such stock at the purchase price plus interest by August 23, 1982 and obtained a letter of credit for the benefit of NISCO to provide the funds for the stock purchase from NISCO. To avoid such repurchase and letter of credit obligations, Debtors caused NISCO to be merged into S & H in July 1982 and took $100,000,000 in cash from S & H to satisfy NISCO's liability to NILIC. In exchange for S & H's payment of $100,000,000 in cash, S & H thus received affiliate securities of little or no value.

104. Through the following series of transactions in July 1982, Debtors removed $25,500,000 in cash from College Life, parent of UL, for assets of little or no value to repay the Chase Loan:

(a) DHB sold College Life 4,600 shares of DHB Class E Preferred Stock—Series 3, par value $1,000 per share in exchange for $4,600,000 in cash. DHB then loaned the $4,600,000 to MGIC.

(b) NISCO sold 20% of the stock of Baldwin Life Insurance Company to College Life for $1,200,000 in cash. The cash was removed by DHB from NISCO without payment of any consideration and loaned to MGIC.

(c) NISCO sold all of the outstanding shares of stock of National Investors Fire & Casualty Company to College Life for $5,400,000 in cash. The cash was removed by DHB without payment of any consideration and loaned to MGIC.

(d) NISCO sold realty located at 1965 Broadway, New York, New York to College Life for $4,400,000 in cash. The cash was taken by DHB without payment of any consideration and contributed to Balunit which then contributed it to MGIC.

(e) B–U sold its stock in a subsidiary, B–U Life Insurance Company, to College Life for $2,800,000 in cash and loaned the cash to MGIC.

(f) Balunit sold real estate to College Life for $7,100,000 in cash and contributed the cash to MGIC.

105. Approximately $102,000,000 in cash were removed from NEL in exchange for assets of little or no value and used to repay Balunit debt. In September 1982, Balunit issued shares of 14% Class B Cumulative Preferred Stock having an aggregate par value of approximately $42,000,000 to a joint venture with McKesson Corporation. In November 1982, Balunit sold substantially all of its interest in the joint venture for approximately $42,000,000 in cash. Balunit used the cash to repay a portion of its debt. In December 1982, NEL paid $60,000,000 in cash to BMF Holding, a subsidiary of the Debtors, in exchange for affiliate securities of little or no value. The cash was transferred by BMF Holding to National Business Services, Inc., a subsidiary of MGIC ("NBS"), for affiliate securities of little or no value. NBS loaned the cash to Balunit.

106. The Insurance Companies directly and indirectly transferred cash in an aggregate amount of $735,000,000 for little or no consideration to Balunit for the benefit of the Debtors.

107. Efforts are now underway to sell MGIC. All estimates of the sale price for MGIC confirm that assuming payment is first made to the Balunit Banks, which hold a security interest in the common stock of MGIC, and to MGIC creditors, little or nothing will remain from the proceeds of the sale for repayment of the $735,000,000 in cash removed from the Insurance Companies and given to Balunit.

108. The transfers were directed by the Debtors with the intent of converting such cash to Debtors' use, which constituted conversion.

109. The transfers violated applicable provisions of the state insurance laws governing investments by the Insurance Companies and transactions between Insurance Companies and affiliates. The Debtors failed to obtain state insurance regulatory approvals required by state insurance laws and such approvals where obtained were granted on the basis of fraudulent misrepresentations and concealment of material information by the Debtors.

110. B–U forced the Indiana Insurance Companies to make fraudulent transfers within one year prior to their petitions for rehabilitation, violating *Ind.Code Ann.* § 27–9–3–14.

111. B–U forced the Indiana Insurance Companies to engage in material transactions with affiliates which were not "fair and reasonable", in violation of *Ind.Code Ann.* § 27–1–23–(a)(1).

112. B–U forced the Arkansas Insurance Companies to invest in assets not meeting the eligibility requirements of *Ark.Stat.Ann.* § 66–2603.

113. B–U forced the Arkansas Insurance Companies to make investments not meeting the diversification requirements of *Ark.Stat.Ann.* § 66–2605.

114. B–U forced the Arkansas Insurance Companies to make extraordinary distributions in violation of *Ark.Stat.Ann.* § 66–5007(c).

115. B–U forced S & H to make investments in its subsidiaries in violation of the limitations imposed by *Ariz.Rev.Stat.Ann.* § 20–481.01.

116. B–U forced the Insurance Companies to transact business with S & H in Arizona without meeting the standards imposed on foreign insurers by *Ariz.Rev. Stat.Ann.* § 20–559.

117. B–U forced S & H to engage in material transactions with affiliates which were not "fair and reasonable" in violation of *Ariz.Rev.Stat.Ann.* § 20–481.12(2).

118. B–U forced NEL and IEL, which were Hawaii domiciled insurance companies at the time of the transactions, to pay a price for affiliate securities above their fair value in violation of Section 431–282(b) of the Hawaii Insurance Laws.

119. B–U forced NEL to invest more than ten percent of its assets in the securities of one person in violation of Section 431–283 of the Hawaii Insurance Laws.

120. The Debtors directed the Insurance Companies to transfer $735,000,000 in cash to Balunit, either directly or through the Debtors, in exchange for consideration of lesser or no value, with the intent of converting Insurance Company moneys to Debtors' use, which constituted conversion.

121. By reason of violation of the applicable state insurance laws, and by reason of Debtors' improper conversion of Insurance Company moneys to Debtors' own use, Debtors are liable to the Insurance Companies in the amount of at least $735,000,000.

122. B–U and DHB are also liable to the Insurance Companies in the amount of at least $735,000,000 for fraud, because the use of Insurance Company moneys to acquire MGIC and to service Balunit debt constituted fraud which depleted Insurance Company funds required to be held in trust for policyholders without substitution of assets of value equal to that of the funds removed from the Insurance Companies by the Debtors.